(No. 60190.—<span style="background:black">     </span>

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WILLIAM YOUNG, Appellant.

*Opinions filed February 22, 1989.—Rehearing denied May 26, 1989.*

2

4

6

10

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport and Frank W. Ralph, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert, David E. Bindi and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

### Review of Batson Issues

JUSTICE WARD delivered the opinion of the court:

The defendant, William Young, an inmate at the Stateville Correctional Center, was indicted in the circuit court of Will County for the murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) of Brian Jackson, who also was an inmate. Following a jury trial, the defendant was found guilty and, upon the State's motion, a death penalty hearing was held. The jury found that there existed one or more of the aggravating factors in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)) and that there were no mitigating factors sufficient to preclude a sentence of death. The defendant was accordingly sentenced to death, but the sentence was stayed pending a direct appeal to this court under section 4(b) of article VI of the Constitution of Illinois (Ill. Const. 1970, art. VI, §4(b)) and Supreme Court Rule 603 (107 Ill. 2d R. 603).

On March 31, 1983, the body of Brian Jackson was discovered in the shower area of the gymnasium at the Stateville Correctional Center. An autopsy showed the cause of death to have been the combined effect of

strangulation and 122 stab wounds. The indictment charged the defendant, Robert Amos, Karl Bell, Bruce Dawkins, Robert Tucker and Paul Williams with the murder of Jackson. The defendant and codefendant Amos were jointly tried and found guilty.

The defendant, who is black, argues that his conviction should be reversed and a new trial ordered on the ground that, *inter alia*, his right to trial by an impartial jury was violated when the prosecution improperly exercised peremptory challenges to exclude all four of the black jurors examined on *voir dire*. The record shows that 58 prospective jurors were examined and that the State exercised 15 peremptory challenges to exclude jurors, four of whom were black. There were four blacks on the venire. The defendant objected at the time to the exercise of peremptory challenges to the black members of the venire, but the trial court, on the basis of *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, overruled the objections. In *Swain*, the Court held that a constitutional question of equal protection in the exercise of peremptory challenges was not presented unless there was a showing of systematic and purposeful exclusion of blacks because of race "in case after case." 380 U.S. at 223, 13 L. Ed. 2d at 774, 85 S. Ct. at 837.

The equal protection clause prohibits the exclusion by peremptory challenge of prospective jurors by the prosecution "solely on account of their race." (*Batson v. Kentucky* (1986), 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83, 106 S. Ct. 1712, 1719; *Strauder v. West Virginia* (1880), 100 U.S. 303, 305, 25 L. Ed. 664, 664.) (A footnote in *Batson* stated: "We express no views on whether the Constitution imposes any limit on the exercise of peremptory challenges by defense counsel." (476 U.S. at 89 n.12, 90 L. Ed. 2d at 82 n.12, 106 S. Ct. at 1718 n.12.))

A defendant contending that the prosecution's exercise of peremptory challenges was racially motivated has

the burden of showing purposeful discrimination. (*Batson v. Kentucky* (1986), 476 U.S. 79, 93, 90 L. Ed. 2d 69, 85, 106 S. Ct. 1712, 1721; *Whitus v. Georgia* (1967), 385 U.S. 545, 550, 17 L. Ed. 2d 599, 603-04, 87 S. Ct. 643, 646.) At the time of the defendant's trial, the Supreme Court's holding in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, governed this evidentiary burden. (See *People v. Lyles* (1985), 106 Ill. 2d 373, 392-95; *People v. Williams* (1983), 97 Ill. 2d 252, 273-74.) Considering the nature of the peremptory challenge, *Swain* considered there was a presumption that the prosecution properly exercised such challenges. To overcome this presumption, a defendant was required to show a systematic and purposeful pattern of excluding venire members from the jury-selection process on the ground of race in "case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be." *Swain v. Alabama* (1965), 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837.

Following the trial of the defendant here and during the pendency of this appeal, the Supreme Court handed down its opinion in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, which, replacing the test for discriminatory exclusion of *Swain*, held that a defendant would be able to establish a *"prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." (476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722-23.) To establish a *prima facie* case:

> "[T]he defendant first must show that he is a member of a cognizable racial group [citation] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges con-

stitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
\*\*\*

Once the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. \*\*\* The prosecutor \*\*\* must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Batson v. Kentucky* (1986), 476 U.S. 79, 96-98, 90 L. Ed. 2d 69, 87-89, 106 S. Ct. 1712, 1723-24.

In *Batson*, a black defendant was tried and convicted by an all-white jury following the prosecution's exercise of peremptory challenges of the only four blacks on the venire. In reversing the conviction, the Court stated that "[b]ecause the trial court flatly rejected the objection without requiring the prosecutor to give an explanation for his action, we remand this case for further proceedings" to determine if the "facts establish, *prima facie*, purposeful discrimination." 476 U.S. at 100, 90 L. Ed. 2d at 90, 106 S. Ct. at 1725.

The Supreme Court has announced that the standard in *Batson* is to be applied retroactively to all cases which pended on direct review and were not yet final. (*Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) Thus, this case, which is before this court on direct appeal, is to be considered under *Batson*. On May 1, 1987, this court, pursuant to its supervisory authority (see 107 Ill. 2d R. 383), remanded for a hearing, in light

of *Batson*, to determine whether racial motivation in the exercise of peremptory challenges was shown.

On remand, the trial court concluded that the defendant established a *prima facie* case of purposeful discrimination by the State based simply on the exclusion of all four of the black veniremen through peremptory challenges. The trial court stated:

> "Gentlemen, my view of the matter is this. I do not believe that the evidence as in the record is sufficient to show that there was a deliberate design, intention on the part of the State's Attorney to exclude blacks. But I am going to make a finding that a *prima facie* case has been made out on the mere numbers. That is to say that there were four on the venire and four were excluded.
>
> The reason why I am making that finding is I do not want the issue of the reasons for the peremptory challenges to be exercised not to be a part of the record, because I think the Supreme Court is entitled to know, and I do not want the case to be going back and forth between the Supreme Court and the Trial Court on the issue."

The court then called upon the State to state its reasons for excusing the black veniremen: Cory McLaughlin, Deborah Glover, Annie Lee and John Mitchell.

The assistant State's Attorney who represented the State at trial stated that he challenged Cory McLaughlin because McLaughlin stated that he knew the defense attorney, Raymond Boldin, and that on his juror questionnaire McLaughlin answered "yes" to the question of whether he had a "physical or mental impairment that would hamper or interfere with *** jury duty." He stated that he excused Deborah Glover because she was divorced and lived alone and that her ex-husband had been convicted of armed robbery and had also been arrested for murder, attempted murder and armed vio-

lence. The assistant State's Attorney said that he excused Annie Lee because:

"[She] was fifty-nine years old. She lived on York Avenue, which is an area wherein there has been some gang activity in the Joliet area. She lives alone. The State had finished with the case of Collins, Wilson and Harris previous to this occasion, wherein single jurors living at home received phone calls which they interpreted as being of a threatening nature. And her, as well as several other ladies who were living at home without—or single or living at home without a husband, were also excused by the State."

Evidence the prosecution introduced at trial showed that the defendant, the victim and the other defendants in the indictment were members of the Vice Lords, a Chicago street gang.

The assistant State's Attorney gave his reasons for challenging John Mitchell:

"If the Court will recall its own memory as to Mr. Mitchell's hesitation with response to certain questions and his demeanor in answering the questions, the State felt that jurors which followed were of a stronger nature to decide the issues in a fair manner."

At the conclusion of the hearing, the trial court made a finding that the State had met its burden of providing neutral, nonracial reasons for excusing the four veniremen and denied the defendant's motion.

The State does not contend that the record does not support the trial court's conclusion that there was a *prima facie* showing of purposeful discrimination. We would observe that in determining whether a defendant has established a *prima facie* showing of purposeful discrimination in the prosecution's exercise of peremptory challenges, a court should consider more than simply the number of jurors excluded. The Supreme Court stated in *Batson*, "[A] court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as

may be available.' " *Batson*, 476 U.S. at 93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1721. See also *State v. Slappy* (Fla. 1988), 522 So. 2d 18, 21-22; *Williams v. State* (Tex. App. 1986), 712 S.W.2d 835, 841; *People v. Thompson* (1981), 79 A.D.2d 87, 111, 435 N.Y.S.2d 739, 755.

The defendant argues that the trial court erred in holding that the prosecution's explanations for excluding the black veniremen were sufficient to discharge its obligation to explain the exercise of peremptory challenges on nonracial grounds. To illustrate this, he contends that the prosecutor's explanation for challenging John Mitchell did not satisfy *Batson*'s requirement that the prosecution offer legitimate, nonracial reasons for the exercise of peremptory challenges. The defendant says that the prosecution should not be allowed to rely upon its objection to a juror's demeanor as a reason for excluding a juror. That reason may be used as a subterfuge for excusing the juror solely on the basis of race and he says that if the prosecution could rely upon such an explanation to rebut the *prima facie* showing of purposeful discrimination, *Batson*'s principle would be illusory. There is appeal to the contention, but demeanor, or outward manner or bearing, as the dictionary describes it, has anciently been regarded as being of significance. The demeanor of a prospective juror has traditionally been a factor of importance in jury selection.

*Voir dire* examination serves the purpose of providing counsel an opportunity not only to question prospective jurors but also to observe their appearance and demeanor. Courts have held that a juror's demeanor may constitute a legitimate and racially neutral reason for excusing him or her. See decisions under *Batson: People v. Talley* (1987), 152 Ill. App. 3d 971, 987 (juror's demeanor and response to questions); *People v. Peters* (1986), 144 Ill. App. 3d 310, 321 (hesitation in responding to questions); *Chambers v. State* (Tex. App. 1987),

724 S.W.2d 440, 442 (juror's "body english"); *State v. Manuel* (La. App. 1987), 517 So. 2d 374, 376 ("unresponsiveness to proceedings").

A trial judge has the opportunity to observe a juror's demeanor during *voir dire* and, experienced in supervising *voir dire* examination, is in a position to evaluate prosecutive explanations for the exercise of peremptory challenges. The Supreme Court stated in *Batson*, "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." (*Batson v. Kentucky* (1986), 476 U.S. 79, 98 n.21, 90 L. Ed. 2d 69, 89 n.21, 106 S. Ct. 1712, 1724 n.21.) The trial judge here, who was the judge who presided over the defendant's trial, found that the prosecution's concern about Mitchell's demeanor was an honest one, and we cannot say that its ruling in this regard was "clearly erroneous." See *United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 330; *United States v. Forbes* (5th Cir. 1987), 816 F.2d 1006, 1010; *State v. Alvarado* (1987), 226 Neb. 195, 410 N.W.2d 118, 121-22; *Baynard v. State* (Del. 1986), 518 A.2d 682, 688.

The defendant further contends that the prosecution's explanation for removing Mitchell should be rejected on the ground that it was not "clear and reasonably specific" as required by *Batson*. (476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1723 n.20.) He says that the explanation was too vague because the prosecutor did not specify which questions Mitchell hesitated in answering or what the prosecutor observed in the other jurors that led him to believe that they were, as he put it, of a "stronger nature."

The defendant's argument does not consider that the *voir dire* in this case was conducted over three years prior to the hearing on remand. At that time, under *Swain*, a prosecutor was not required to articulate the

reasons for the exercise of his peremptory challenges absent a finding of purposeful discrimination in "case after case." Too, a peremptory challenge traditionally could be based on no more than " ' "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another." ' " (*Batson*, 476 U.S. at 135, 90 L. Ed. 2d at 113, 106 S. Ct. at 1743 (Rehnquist, J., dissenting), quoting *Swain*, 380 U.S. at 220, 13 L. Ed. 2d at 772, 85 S. Ct. at 836.) One could not reasonably expect to require the prosecution to recall with specificity what the defendant says is required. In light of the circumstances, we judge that the prosecution's explanation satisfied *Batson*.

The defendant also objects to the prosecution's explanation for excusing another black juror, Annie Lee, because it was not "related to" the outcome of this case as is required by *Batson*. (476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1723 n.20.) He argues that the other trial that the prosecutor referred to in which jurors were purportedly intimidated by gang members involved a different gang and prison. Therefore, the defendant asserts, there is nothing to substantiate the prosecutor's concern that Lee might be intimidated by gang members.

The prosecutor's concern was clearly supported by the record. At the hearing, the trial judge stated:

"[T]wo weeks ago I attended a public meeting called by Senator Dunn for the sole purpose of discussing gang activity in the City of Joliet, and what is to be done about it, because it is becoming a serious question.

And I will also tell you that in that previous murder case with Stateville that [the prosecutor] was talking about, there were phone calls that were made to jurors. We do not know who made the phone calls, but we do know that phone calls were made. And any right-minded person would immediately suspect those were gang phone calls."

While the previous trial referred to did not involve the same gang or prison, the prosecution's concern that Lee's deliberations in the murder trial of an incarcerated gang leader, the defendant, might be influenced was sufficiently related to this case to satisfy *Batson*.

The defendant argues, however, that the prosecution's explanation for excusing Mitchell and Lee should be rejected because the prosecution did not remove white jurors for the same factors that the prosecution found objectionable in them. He says that the prosecutor's notes taken during *voir dire*, which were submitted into evidence at the hearing on remand, indicate that the prosecutor observed that another juror, John Powell, who is white, hesitated when asked questions during *voir dire*. The defendant further asserts that although the prosecutor stated that he excused Lee because she lived alone in an area where gang activity had been reported, he did not excuse other jurors who were white and lived alone in reputed gang areas. The defendant argues that because the prosecutor did not exercise peremptory challenges to excuse white jurors on the same basis that he exercised them against black jurors, it must be assumed that the prosecution's explanations were merely a pretext to hide a racial motivation for the strikes. What the defendant argues should not be lightly dismissed. We must keep in mind, however, the nature of the peremptory challenge and the inherent problems involved in a hearing of this character. If a prosecutor excused one person and not another it does not follow that this in itself shows that the prosecutor's explanations were pretextual.

Though a part of the prosecutor's explanations may have been applicable to white jurors who were not challenged, the white jurors may have, in some other respect, exhibited a trait which the prosecutor reasonably

could have believed would make him or her desirable as a juror. Too, although the prosecutor did not challenge every white prospective juror who may have lived in an area where gang activity has been reported, he did state that he removed some such jurors. This question and all others involved in the hearing were for the trial judge, who had also presided at the *voir dire.* Considering the "great deference" to be given the trial court's findings, we cannot say that the trial court erred in finding that the prosecutor sustained his burden of rebutting the inference of purposeful discrimination.

The prosecutor's explanations for removing the other black jurors, Cory McLaughlin and Deborah Glover, were clearly not improper and the defendant does not contest them. Too, we would observe that the record shows that the defendant, the victim and all of the witnesses at trial were black and members of the same cell block. This would appear to avoid any argument based on racial difference between such persons. (See *United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 332; *State v. Antwine* (Mo. 1987), 743 S.W.2d 51, 67.) We would note, too, that the Supreme Court in *Batson* stated that the prosecution's explanations for the exercise of peremptory challenges "need not rise to the level justifying the exercise of a challenge for cause." (*Batson v. Kentucky* (1986), 476 U.S. 79, 97, 90 L. Ed. 2d 69, 88, 106 S. Ct. 1712, 1723.) The court did not err in denying the defendant's motion.

The defendant also makes contentions that he was deprived of a fair hearing as a result of procedural errors. First, he contends, without citing authority, that the trial court erred in not compelling the prosecutor to state the reasons for the exercise of peremptory challenges under oath and subject to cross-examination.

Had the Supreme Court intended that the prosecutor was to be required to state the reasons for the exercise

of preemptory challenges under oath and subject to cross-examination, it would have been a simple thing for the court to have said so. It did not do so, saying only that if and when the defendant made a *prima facie* showing of purposeful discrimination, the prosecutor was to come forward with a neutral explanation for the challenge to a black juror. There was no suggestion by the court that there was to be what could amount to a trial within a trial. Not only did the Court not state that the prosecutor was to testify as a witness and be subject to cross-examination, but it explicitly declined to formulate what was to be done to implement its decision "[i]n light of the variety of jury selection practices followed in our state and federal trial courts." (*Batson v. Kentucky* (1986), 476 U.S. 79, 99 n. 24, 90 L. Ed. 2d 69, 90 n.24, 106 S. Ct. 1712, 1724 n.24.) The *Batson* Court left the nature of the proceeding to ascertain the presence or absence of purposeful discrimination to the determination of State courts. That the Supreme Court did not intend to compel the prosecutor, and maybe defense counsel, to become a witness at what in many instances could turn into a trial within a trial is understandable. The prosecutor and defense counsel, as officers of the court, should be regarded as under a high professional obligation to speak truthfully. Too, a serious question would arise as to whether the attorney could properly be both a witness and an advocate. (See ABA Model Rules of Professional Conduct Rule 3.7 (1980).) The comment to the rule in part states:

> "The opposing party has proper objection where the combination of roles [as advocate and witness] may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others."

If the prosecutor were to be a witness, it might be necessary to permit the bringing in of additional counsel to represent the prosecutor and to serve as advocate in the hearing. It seems predictable, too, that there would be instances in which defense counsel would ask that others who were present at the *voir dire*, such as second counsel and police officers at the counsel table, be called to testify. There may also be other situations in which the testimony of defense counsel would be sought by the prosecution regarding, for example, conversations between counsel and other happenings during the *voir dire*. We do not consider that the Supreme Court contemplated that there would be a proceeding that the defendant's request here might involve. While there are suggestions in a few decisions that the prosecutor was under oath at a hearing, there is nothing in them to suggest that it was done to comply with a requirement of the Supreme Court that was announced in *Batson*. It appears that the Supreme Court of North Carolina is the only court of review that has directly addressed the question. That court held that a defendant does not have a right to call the prosecutor to testify as to reasons for the exercise of preemptory challenges. (*State v. Jackson* (1988), 322 N.C. 251, 368 S.E.2d 838.) The court stated:

> "In balancing the arguments for and against such an examination, we believe the disruption to a trial which could occur if an attorney in a case were called as a witness overbears any good which could be obtained by his testimony. We do not believe we should have a trial within a trial. The presiding judges are capable of passing on the credibility of prosecuting attorneys without the benefit of cross-examination." *State v. Jackson* (1988), 322 N.C. 251, 258, 368 S.E.2d 838, 842.

The defendant says too that the trial court erred in denying his motion for a continuance. At the hearing, after the prosecutor stated the reason for his strikes, the

defendant requested a continuance in order to investigate whether anyone else present at the *voir dire* had seen Mitchell hesitate; whether any other jurors hesitated; and whether any white jurors, who were not excluded by the prosecution, lived in areas where gang activity had been reported.

Whether to grant a continuance is within the sound discretion of the trial court. (Ill. Rev. Stat. 1983, ch. 38, par. 114—4(e).) A defendant challenging the denial of a motion for continuance must show that his rights were prejudiced or he was impeded in the preparation of his defense. (*People v. Canaday* (1971), 49 Ill. 2d 416.) The defendant here has failed to show that he was prejudiced in either regard. He said he sought the continuance to gather evidence that the prosecution did not challenge white jurors with characteristics on which the prosecutor stated he relied to remove black jurors. As stated, we considered that the trial court did not err in finding that the prosecutor was not racially motivated in exercising peremptory challenges for the reasons discussed. We judge that the trial court did not abuse discretion in denying a motion to allow the defendant to gather additional evidence on a question the judge had decided and where he had presided over the proceeding under examination. The defendant makes a related point that after the trial judge denied the defendant's motion for a continuance, he allowed, as an offer of proof, the defendant, his trial counsel, and codefendant Robert Amos to testify in essence that, in their opinion, John Mitchell did not hesitate in answering *voir dire* questions.

While a defendant generally should be permitted to offer evidence to rebut the prosecution's explanations for the exercise of peremptory challenges (see *People v. Slappy* (Fla. 1988), 522 So. 2d 18; *Ex parte Branch* (Ala. 1987), 526 So. 2d 609, 624; *State v. Antwine* (Mo. 1987), 743 S.W.2d 51, 65), the trial court did not abuse discre-

tion here in not admitting the testimony. The trial judge himself was present at and presided over the *voir dire* and had the opportunity to observe the prospective juror's demeanor directly.

For the reasons given, the judgment of the circuit court on the *Batson* issue is affirmed.

*Judgment affirmed.*

STAMOS and CALVO, JJ., took no part in the consideration or decision of this case.

*Review on Direct Appeal*

JUSTICE RYAN delivered the opinion of the court:

In this case the sentence of death was imposed on the defendant. On appeal, the defendant, who is black, complained that at the guilt phase of the trial, the prosecutor violated the defendant's equal protection rights by using peremptory challenges to exclude four blacks from the jury. While this case was pending on appeal, the Supreme Court decided *Batson v. Kentucky* (1986), 476 U.S. 70, 90 L. Ed. 2d 69, 106 S. Ct. 1712, which held that a defendant may establish a *prima facie* case of discrimination by showing that he is a member of a cognizable racial group, and that the prosecution exercised peremptory challenges to remove from the jury members of the defendant's race. While this case was under advisement, the Supreme Court held, in *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, that *Batson* is to be applied retroactively to all cases pending on direct review not yet final. This case was therefore remanded to the circuit court of Will County for a *Batson* hearing. The trial court found that the prosecution's explanations for the use of peremptory challenges to exclude four black jurors were racially neutral. In an opinion filed today the holding of the trial

court was affirmed. We now consider the other issues that have been raised on this appeal.

The defendant, William Young, an inmate at the Stateville Correctional Center, was indicted along with fellow inmates Robert Amos, Karl Bell, Paul Williams, Bruce Dawkins, and Robert Tucker for the murder of inmate Brian Jackson (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)). After a severance, William Young and Robert Amos were jointly tried, apart from the other defendants. Following a jury trial in the circuit court of Will County, defendant Young and codefendant Amos were found guilty of murder. The State requested a separate sentencing hearing to consider whether the death penalty should be imposed (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)). Codefendant Amos waived his right to a jury determination on the death penalty and his sentencing hearing was severed from the defendant's (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d)(3)). The trial judge determined that Amos was eligible for the death penalty, but found a factor in mitigation that precluded imposition of the death sentence. Amos was subsequently sentenced to 35 years' imprisonment to run consecutively to the sentence he was serving. Defendant Young requested a jury for the death penalty hearing. At a bifurcated sentencing hearing, the same jury found the existence of statutory aggravating factors (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(2), (b)(3)), and concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the circuit court sentenced the defendant to death (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(h)). The sentence was stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). In this opinion, we consider only the conviction and death sentence of William Young.

The following evidence was presented at the guilt phase of the trial of William Young and Robert Amos.

On March 31, 1983, 137 inmates of cellhouse B-East were exercising in the multipurpose building (gymnasium) of the Stateville prison. The exercise period lasted from 12:30 p.m. until 1:30 p.m. During this period, an intergang meeting took place in the washroom of the gymnasium.

The intergang meeting lasted 10 or 15 minutes. Inmates Paul Williams, Joe Williams, Bruce Dawkins, Robert Tucker, Karl Bell, William Young, Robert Amos, and Brian Jackson, all members of the Vice Lords, returned to the washroom for a second meeting. (The washroom, which is separated from the gymnasium by a door, is divided into three areas: a shower area, a locker area, and a bathroom.) The purpose of this second meeting was to administer a physical "violation" to Brian Jackson. A violation was defined as a punishment for breaking the rules of the gang.

The evidence shows that Brian Jackson was found dead in the shower area of the gymnasium washroom at the end of the exercise period. Correctional officers quickly secured the gymnasium. The inmates were placed in the bleachers. Each inmate was thereafter individually screened and interrogated.

Vernon Willis, chief of security at Stateville, testified that during the closedown, he noticed codefendant Amos sitting in the bleachers wearing only shorts. Willis stated that he proceeded to the area underneath the bleachers. He testified that he observed Amos attempting to stuff a pair of bluejeans through the bleachers. The bluejeans were seized and taken to a crime-scene technician.

Melvin Trojanowski, a crime-scene technician with the Illinois Department of Law Enforcement, scanned each inmate's clothing, shoes, and person with an ultraviolet light for the presence of stains. Trojanowski stated that during this process he received a pair of bluejeans from a Department of Corrections officer. He testified that

the bluejeans contained a reddish-brown bloodlike substance.

Hayden Baldwin, a sergeant with the Illinois State Police on assignment to the Illinois Bureau of Technical Field Services, processed the locker, shower, and bathroom areas of the washroom. Baldwin testified that he observed large amounts of blood on the floor and the walls of the shower area. He stated that he recovered from a corner of the shower area floor a pair of blue shorts with the defendant's institutional identification number. A long cotton string was also retrieved from the floor of the shower area near the victim's feet. Baldwin further stated that he had noticed that a ventilation frame above a shower head was missing. The vent leads to a plumbing access room located directly behind the shower heads. There is no entrance to the access room from the washroom. Baldwin testified that he retrieved the vent frame from the floor of the access room, along with a carpenter's T-bevel handle, the blade of the T-bevel which had broken off, a folding knife inside a white glove, a long, round, metal rod, a gray sweatjacket with the name "Top Dog" embroidered on the back, a blue web belt, and a black leather belt.

David Metzger, a Department of Law Enforcement forensic scientist specializing in forensic serology, examined each item of physical evidence for the presence of bloodstains. Metzger testified that he analyzed the blood sample of the victim and compared the results with his analyses of samples of blood found on the items of physical evidence. He concluded that bloodstains found on the blue shorts, the gray sweatjacket, the bluejeans, and the vent frame were consistent with the victim's blood type.

Dr. Edward Shalgos, a forensic pathologist who performed the autopsy, testified that Brian Jackson sustained a total of 122 stabbing or cutting wounds. Dr. Shalgos indicated that the wounds resulted from at least

three different cutting-type instruments. When shown the folding knife, the carpenter's T-bevel handle and blade, and the long, round, metal rod, Dr. Shalgos testified that these instruments were "compatible" with the nature of the wounds incurred by the victim. Dr. Shalgos also stated that there were "defense" wounds on the arms and hands, thus indicating that the victim had tried to ward off his assailants. Dr. Shalgos further testified that the front side of the victim's neck showed ligature abrasion. Dr. Shalgos determined the cause of death to have been the combined effects of exsanguination with shock and ligature strangulation.

The chief prosecution witnesses were inmates Joe and Paul Williams. As to the events which occurred in the washroom during the second meeting, Joe Williams testified that he was standing in the bathroom area with Dawkins and Tucker while Amos, Bell, Jackson, and the defendant had a conversation in the shower area. The defendant told Jackson that he was in "violation" and asked him how he was going to accept it. Jackson responded that he was going to accept it like a man. On the defendant's order, Amos and Bell began striking Jackson with their fists. After a few minutes, the defendant ordered Amos and Bell to stop the beating. The defendant walked out of the shower area, past Joe Williams, and proceeded toward the washroom door, where Paul Williams was standing guard outside. Paul Williams gave the defendant a long, round, metal rod and a carpenter's T-bevel. The defendant took one of the weapons and gave the other to Amos. Bell then held Jackson while the defendant and Amos repeatedly stabbed him. Jackson fought against the defendant, Bell, and Amos. In the course of the struggle, the shank wielded by the defendant broke. The defendant gave the broken shank to Bell, who continued to stab Jackson until he fell. After checking Jackson's pulse, the defendant determined that Jack-

son was still alive. The defendant then ordered Dawkins and Tucker to strangle Jackson. Dawkins wrapped his belt around Jackson's neck and pulled, but it broke. The defendant directed Joe Williams to surrender his belt, which he did. Dawkins and Tucker resumed strangling Jackson until he was dead. The defendant and Amos subsequently removed their bloodied clothing and washed up in the sinks. Amos took the clothing and shanks and stuffed them down a vent located above one of the shower heads. At that point, Dawkins, Tucker, Bell, Amos, Joe Williams, and the defendant left the washroom.

In an apparent attempt to reduce the impact of his criminal record on the jury, Joe Williams admitted on direct examination that he had seven prior convictions, three for burglary, one for residential burglary, one for possession of burglary tools, one for auto theft, and one for criminal damage to property. On cross-examination, Williams admitted that he had been a heroin addict from 1974 to 1980. He also acknowledged on cross-examination that the State had not prosecuted him for his role in this killing, that he had been transferred to another penitentiary for his own security, and that the victim's blood had been found on the bottom of his shoe. Further cross-examination established that he had made contradictory statements to investigation officers. Cross-examination also revealed that Williams was a Vice Lords "elite" (first in command in the Vice Lords' hierarchy) outside of prison, though he claimed he was no longer a member of that gang.

Inmate Paul Williams also testified as to the events of March 31, 1983. Paul Williams stated that he went to the defendant's cell to escort the defendant to the gymnasium for the exercise period. Prior to arriving in the gym, Williams testified that he received a carpenter's T-bevel and a long, round, metal rod from Robert Amos.

Williams hid the weapons in the sleeve of his coat. Williams stated that he gave them to Robert Tucker during the second meeting. Tucker had indicated to Williams that the defendant wanted the weapons. Tucker took the weapons into the locker room. After 25 minutes, Paul Williams saw Amos, Tucker, Dawkins, Bell, Joe Williams, and the defendant emerge from the washroom. When the second meeting began, codefendant Amos had been wearing bluejeans and a gray sweatjacket with the words "Top Dog" embroidered on the back. The defendant had been wearing oversized sweatpants, a T-shirt, and a thin jacket. Paul Williams stated that when Amos left the washroom, he no longer wore the "Top Dog" sweatjacket. Williams also indicated that the defendant had changed his clothing.

Paul Williams further testified on direct examination that he had a conversation with the defendant in which the defendant recounted his version of the murder. According to Williams, the defendant admitted that he stabbed Brian Jackson, that the weapon broke, and that he used another weapon to stab him in the head. Amos, Tucker, Dawkins, and Bell also stabbed Jackson. The defendant related to Williams that after the stabbing, he noticed that Jackson was still breathing and had a pulse. The defendant took the drawstring from his sweatpants and began to strangle Jackson. The string broke. The defendant then took a belt from Dawkins and strangled Jackson further. The defendant told Williams that the victim pleaded for his life, but the defendant responded that this was a death move. The defendant also told Williams that he would never forget the look in Jackson's eyes when he died.

Paul Williams admitted on direct examination that he had prior convictions for the offenses of rape, armed robbery, and escape. Williams also acknowledged on direct examination that the State agreed to dismiss the

charge of murder (accountability) in exchange for Williams' blind guilty plea to aggravated battery, conspiracy to commit intimidation, and mob action. On cross-examination, it was established that Williams had made statements that conflicted with his trial testimony. Further cross-examination revealed that Williams had been in segregation for six months for assaulting an inmate. Williams also indicated on cross-examination that the defendant was the Vice Lords "elite" in cellhouse B-East. Williams stated that he had been the "elite" for over one year until replaced by the defendant.

Codefendant Robert Amos, testifying in his own behalf, acknowledged prior convictions for armed robbery, burglary, and aggravated battery. His testimony was consistent with that of Paul Williams and Joe Williams concerning the identity of the persons present, the fact that two meetings took place in the washroom, and the fact that Brian Jackson was murdered during the second meeting. Amos testified that Jackson knew he was to receive a physical "violation" during the second meeting for "raping" Bruce Dawkins. Amos stated he began striking Jackson in the chest with his fists. Joe Williams, however, ordered Amos to stop. Joe Williams then sent Robert Tucker to the door "to get a paper bag from Paul Williams." When Tucker returned with the bag, he withdrew a carpenter's T-bevel and a long, round, metal rod. Tucker handed one of the weapons to Dawkins, and kept the other. According to Amos, the defendant asked Joe Williams, "What is happening? What is he doing man?" Joe Williams responded, "This ain't none of your business. Stay out of my business." The defendant said, "I am the elite of the cellhouse." Joe Williams answered, "I am carrying it out the way it is supposed to be carried out." Bell then produced his own pocket knife and Dawkins, Bell, and Tucker started stabbing Jackson. The defendant argued with Joe Williams briefly about Wil-

liams' authority. Amos testified that he then left with the defendant to take the matter up with the "Supreme Elite."

Amos stated on direct examination that neither he nor the defendant stabbed Jackson. He further stated that he never saw the strangulation. Amos testified that he removed his bluejeans after noticing bloodstains on them. Amos explained that the victim had bumped into him during the struggle. He also admitted on direct examination attempting to stuff the bluejeans down the bleachers. Amos, however, denied wearing the gray sweatjacket with "Top Dog" printed on the back, denied delivering the weapons to Paul Williams, and denied ownership of a pair of white gloves found in the access room.

On cross-examination, Amos admitted that he had been interviewed three times by investigators, but that he had not made any statements concerning Jackson's death until his testimony at trial. Amos described Paul Williams as a former "elite" who was now second in command in the Vice Lords' hierarchy. Amos stated that the defendant and Joe Williams were both "elites" and that the defendant did not necessarily outrank Paul Williams. Amos also acknowledged that he was formerly the Vice Lords' assistant chief of security, though he claimed he was no longer a member of that gang.

Inmate Bruce Dawkins testified for the State in rebuttal. Dawkins admitted Brian Jackson was his best friend, but denied engaging in a sex act with him. Dawkins stated that Amos, Bell, and the defendant stabbed Jackson with weapons delivered by Paul Williams. After the stabbing, Dawkins and Tucker were ordered by the defendant to strangle the victim. The first belt broke, so they continued to strangle Jackson using Tucker's belt. The defendant also used the drawstring from his sweatpants to strangle the victim. Dawkins stated that he did not realize his acts of stran-

gulation could kill the victim. Dawkins, however, apparently contradicted the testimony of Paul Williams, Joe Williams, and Robert Amos by testifying that he did not recall seeing Joe Williams in the shower room during the stabbing and strangling of Brian Jackson.

Dawkins admitted on direct examination that he had six prior convictions for armed robbery. In addition, Dawkins acknowledged that the State agreed to recommend a sentence of 25 years' imprisonment in exchange for his guilty plea to murder. Cross-examination established that Dawkins had lied to investigators. Dawkins admitted that in an April 4, 1983, interview with investigators, he did not mention his own participation in Jackson's strangulation.

After hearing all of the evidence and receiving instructions from the trial judge, the jury found the defendant guilty of the murder of Brian Jackson. At the State's request, a sentencing hearing was convened to determine whether the death penalty should be imposed. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(d).) The defendant elected to proceed before the same jury that determined guilt, and a bifurcated hearing was conducted.

In the first phase of the hearing, the State introduced evidence that the defendant was 32 years old at the time he committed the murder of Brian Jackson, that Brian Jackson was an inmate at an institutional facility of the Department of Corrections, and that the defendant previously had been convicted for the 1976 murder of Edward Cole. The jury thus found the defendant eligible for the imposition of the death penalty (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(2), (b)(3)).

In the second phase of the sentencing hearing, the parties presented evidence in aggravation and mitigation. The State established that the defendant's prior criminal record included convictions on one count of rape, five counts of armed robbery, and one count of un-

lawful use of weapons. The State also introduced evidence of the defendant's alleged involvement in the murder of Joseph Kendrick and the attempted murder of Richard Soothy. Joseph Kendrick was shot by two intruders in his apartment. Richard Soothy identified the defendant as one of the intruders. The defendant admitted his presence at the scene. However, an indictment against him was dismissed because Soothy was unavailable to testify. Finally, the State presented evidence that at the sentencing hearing for the 1976 murder of Edward Cole, the defendant threatened the life of the prosecutor and verbally abused the trial judge.

In mitigation, the defense presented a stipulation that, prior to trial, Bruce Dawkins and Robert Tucker pled guilty to the murder of Brian Jackson in exchange for sentences of 25 years' imprisonment. The stipulation also acknowledged that Karl Bell pled guilty to the murder in exchange for the State's pledge not to seek the death penalty against him.

The jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court therefore sentenced the defendant to death. The sentence was stayed under the provisions of Supreme Court Rule 609 (107 Ill. 2d R. 609(a)), pending the final order of this court. The case is before us on direct appeal. Ill. Const. 1970, art. IV, §4(b); 107 Ill. 2d R. 603.

We note that the defendant's trial counsel failed to file a written post-trial motion as required by section 116—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 116—1).

The general rule followed by this court is that the failure to raise an issue in the written motion for a new trial constitutes a waiver of that issue and, therefore, it cannot be urged as a ground for reversal on review. (*People v. Wright* (1985), 111 Ill. 2d 128, 148; *People v.*

*Thurman* (1984), 104 Ill. 2d 326, 329-30; *People v. Huckstead* (1982), 91 Ill. 2d 536, 543; *People v. Precup* (1978), 73 Ill. 2d 7, 16-17; *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.) Requiring the defendant's written motion for a new trial to specify the errors allegedly entitling him to a new trial serves two purposes. First, it saves the delay and expense inherent in an appeal in those instances where the motion is meritorious. Second, it focuses the attention of the trial judge upon those aspects of the proceedings of which the defendant complains and thus gives the reviewing court the benefit of the judgment and the observations of the trial court with reference thereto. (*People v. Irwin* (1965), 32 Ill. 2d 441, 443-44.) We have recognized, however, that the waiver doctrine is not absolute. Supreme Court Rule 615 sets forth a limited exception to the waiver rule by permitting a reviewing court, in its discretion, to consider "[p]lain errors or defects affecting substantial rights." 107 Ill. 2d R. 615(a).

In *People v. Enoch* (1988), 122 Ill. 2d 176, this court recognized that our constitution requires us to review all cases in which the death penalty has been imposed. (Ill. Const. 1970, art. VI, §4(b).) We noted, however, that our constitutional obligation does not require us to review every issue raised on appeal when the issues have not been properly preserved by objecting in the trial court and including the alleged errors in a written post-trial motion. In *Enoch*, we defined the limits of our review when the defendant has not complied with the statutory obligation to file a post-trial motion. We held, in *Enoch*, that in such cases our review would be limited to constitutional issues which had been properly raised at trial and which could be raised later in a post-conviction petition. (Ill. Rev. Stat. 1983, ch. 38, par. 122—1.) We held in *Enoch* that we will also consider the sufficiency of the evidence and, as noted above, plain errors affecting sub-

stantial rights, as provided by Rule 615(a). See *People v. Enoch*, 122 Ill. 2d at 190.

The defendant contends that there were numerous errors at the guilt phase of the trial which require reversal of his conviction. The defendant's first assignment of error springs from the denial of disclosure of summaries of oral statements made before trial by prosecution witness Paul Williams to an assistant State's Attorney. Supreme Court Rule 412(a) provides that the State shall disclose to defense counsel, upon written motion, the following material and information within its possession or control:

> "(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel." (107 Ill. 2d R. 412(a)(i).)

Paul Williams gave a written statement which was provided to defense counsel. The statement was made to Department of Corrections investigator Russell Nelson on April 1, 1983, and recorded by him. In addition, the record shows that between May 1983 and May 1984, an assistant State's Attorney conducted four interviews with Paul Williams, totalling approximately 75 minutes. The State admitted that notes of these conversations with Paul Williams existed. On the day of trial, defense counsel orally moved for disclosure of any memorandum summarizing Paul Williams' oral statements in these pretrial interviews. The assistant State's Attorney took the position that the notes were not verbatim statements and that the State therefore was not obligated to produce them. De-

fense counsel requested the circuit court to make an *in camera* inspection of these notes. The circuit court accepted the assistant State's Attorney's declarations that the interview notes were not verbatim statements and refused to review the documents, absent a showing by the defendant that the notes contained verbatim or substantially verbatim reports of oral statements.

Two days later, after the direct examination of Paul Williams was completed, the defense filed a written motion renewing its request for production of the interview notes. In support of its motion, the defense called Paul Williams. Although Williams stated that he could not recall whether notes were taken during the interviews, the defense argued that the assistant State's Attorney's admission that three pages of notes existed was sufficient to require the circuit court to conduct an *in camera* inspection. The court refused and denied the motion. The court, however, offered to impound the notes and make them part of the record for later review. Unfortunately, the defense never requested the circuit court to impound the interview notes.

The defendant contends that the circuit court erred in relying on the assistant State's Attorney's representations that the notes did not contain verbatim statements. We agree. The determination whether memoranda contain verbatim or substantially verbatim reports summarizing a witness' oral statements is to be made by the court, not the prosecutor. The committee comments to Rule 412 support our conclusion:

"Paragraph (a), subparagraph (i), requires the additional production of any substantially verbatim report of an oral statement by a witness. The State is also obliged to produce a list of all memoranda reporting or summarizing oral statements *whether or not the memoranda appear to the State to be substantially verbatim reports of such statements. The defense is then entitled, upon filing of a written*

*motion, to have the court examine the memoranda listed by the State.* If the court finds that the memoranda do contain substantially verbatim reports of witness statements, the memoranda will be disclosed to defense counsel. This additional requirement serves two purposes. *First, it ensures that the final responsibility for determining what is producible rests with the court.* Second, it establishes, as a matter of record, the contents of the State's file with respect to reports of witness' statements and thereby facilitates appellate review of contested questions of discovery under this subsection." (Emphasis added.) 107 Ill. 2d R. 412, Committee Comments at 493-94.

We agree with the defendant that he was entitled to have the assistant State's Attorney's notes of the pretrial interviews with Paul Williams produced for *in camera* inspection by the circuit court, and to the disclosure of any unprivileged, substantially verbatim statements they contained for possible use in impeaching Paul Williams' testimony. (*People v. Szabo* (1983), 94 Ill. 2d 327, 345; see *People v. Boclair* (1987), 119 Ill. 2d 368.) However, any error that occurred was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Owens* (1984), 102 Ill. 2d 88, 103-04; *People v. Bryant* (1983), 94 Ill. 2d 514, 522-23; *People v. Moore* (1972), 51 Ill. 2d 79, 82; *People v. Smith* (1967), 38 Ill. 2d 13, 17.) In reaching this determination, we reject the argument that the circuit court's ruling denying an *in camera* inspection deprived the defendant of the opportunity to effectively cross-examine Paul Williams, thereby denying him the right of confrontation guaranteed by the sixth and fourteenth amendments of the Constitution of the United States.

In *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431, the Supreme Court considered whether the denial of the opportunity to effectively cross-examine an adverse witness for bias consti-

tuted prejudicial error. In that case, the defendant was convicted of murder in a Delaware trial court. During the cross-examination of one of the 16 prosecution witnesses, defense counsel sought to impeach the witness for bias by questioning him about the dismissal of a criminal charge against him after he had agreed to speak with the prosecutor about the murder. When the prosecutor objected, the trial court allowed counsel to question the witness on the matter outside the presence of the jury. The witness acknowledged that the criminal charge had been dropped in exchange for his promise to speak with the prosecution about the murder, but denied that the agreement had affected his testimony. The trial court thus barred any cross-examination about that agreement. The supreme court of Delaware reversed the conviction on the ground that the trial court, by refusing to allow defense counsel the opportunity to cross-examine the prosecution witness about the agreement, violated the defendant's rights under the confrontation clause of the sixth and fourteenth amendments to the United States Constitution. In reversing the supreme court of Delaware, the Supreme Court held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." (475 U.S. at 684, 89 L. Ed. 2d at 686, 106 S. Ct. at 1438.) Rejecting the argument that a blanket prohibition against exploring potential bias is error that warrants reversal of a conviction regardless of actual prejudice, the Court concluded that the proper test is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." (475 U.S. at 684, 89 L. Ed. 2d at 686, 106 S. Ct. at 1438.) In determining whether such an error is harmless in *a particular* case, the Court

directed reviewing courts to consider a host of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." 475 U.S. at 684, 89 L. Ed. 2d at 686-87, 106 S. Ct. at 1438.

After considering the factors enunciated in *Van Arsdall*, we conclude that the defendant was not prejudiced by the State's nondisclosure of the interview notes. In reaching this conclusion, we believe it is useful to distinguish this case from *People v. Szabo* (1983), 94 Ill. 2d 327, where we were unable to say either that the nondisclosure resulted in prejudicial error, or that any error that occurred was harmless beyond a reasonable doubt. In *Szabo*, the alleged accomplice was the only occurrence witness. His testimony was thus central to the State's case against Szabo. Here, in contrast, Paul Williams was not an occurrence witness. Joe Williams and Bruce Dawkins testified as eyewitnesses to the events that occurred in the washroom during the second meeting. In *Szabo*, strong circumstantial evidence was introduced that linked Szabo with his accomplice and with the crimes. However, the accomplice's testimony concerning Szabo's lead role in planning and carrying out the crimes was the only evidence tending to establish that Szabo premeditated the murders. Because this testimony was essential in proving that Szabo possessed the requisite mental state for a conviction of intentional murder, effective cross-examination of Szabo's accomplice was crucial to his defense. Here, as in *Szabo*, significant circumstantial evidence linked the defendant to the crime. However, because Paul Williams' testimony was not the only evidence tending to establish that the defendant, William

Young, committed the murder of Brian Jackson, effective cross-examination of Paul Williams was not critical to Young's defense. Although the interview notes may have contained prior statements flatly contradicting Paul Williams' testimony, or possibly revealing an unsuspected motive for testifying as he did, or giving such varying accounts as would have greatly discredited his testimony, we do not believe that the denial of the opportunity to use the interview notes in cross-examining Paul Williams affected the reliability of the fact-finding process at trial. Therefore, we cannot say that there is a reasonable doubt that the defendant would not have been convicted if the circuit court had conducted an *in camera* inspection of the assistant State's Attorney's notes of pretrial interviews with Paul Williams. Any error in this regard was thus harmless beyond a reasonable doubt.

The second assignment of error raised by the defendant involves the testimony of Department of Corrections investigator Russell Nelson. The record indicates that Paul Williams made statements to prison investigators on March 31, April 1, April 8, and April 29 of 1983. On March 31, the day of the killing, Williams denied to investigators that he had any knowledge of the circumstances of Brian Jackson's death. On April 1 and April 8, Williams provided statements that were similar to his trial testimony, but omitted the statements about the look in Jackson's eyes and Jackson's pleading for his life. On April 29, Williams repudiated his earlier April statements. On cross-examination, defense counsel elicited from Williams that the State agreed to dismiss the charge of murder in exchange for Williams' blind guilty plea to aggravated battery, conspiracy to commit intimidation, and mob action. Defense counsel thus attempted to compare the timing of the statements that implicated the defendant with the timing of the State's reducing Williams' charges. Over a defense objection, the State

was allowed to recall Russell Nelson. Nelson testified to the April 1 and 8 statements made by Williams. The substance of these prior statements was consistent with Williams' trial testimony.

This alleged error involved no more than an evidentiary ruling. It did not involve plain error affecting substantial rights (107 Ill. 2d R. 615(a)). It did not involve a constitutional issue that could be raised later in a post-conviction hearing petition (Ill. Rev. Stat. 1981, ch. 38, par. 122—1). This alleged error also did not involve the question of the sufficiency of the evidence. Therefore, under the guidelines set forth in *People v. Enoch*, any error in the admission of Russell Nelson's testimony has been waived by the failure to file the post-trial motion.

The defendant's third assignment of error involves two alleged instances of prosecutorial misconduct. The defendant contends that the prosecutor, in closing arguments at the guilt phase of the trial, made comments that were improper and prejudicial and, therefore, his conviction should be reversed. We again note that none of the remarks listed were mentioned in a written post-trial motion. Further, only one of the alleged improper remarks discussed in the defendant's brief was objected to at trial. Error, if any, resulting from these remarks is therefore deemed waived under the holding in *Enoch*.

The defendant, however, urges us to consider the prosecutor's remarks in closing argument as plain error. Plain error may be considered where the record clearly shows that an alleged error affecting substantial rights was committed. (*People v. Foster* (1979), 76 Ill. 2d 365, 380; *People v. Precup* (1979), 73 Ill. 2d 7, 16-17; 107 Ill. 2d R. 615(a).) The purpose of the plain error rule is two-fold. First, the rule affords certain protections to the accused by correcting serious injustices. Second, the rule protects and preserves the integrity and reputation of the judicial process. (*People v. Baynes* (1981), 88 Ill. 2d

225, 233-34; *People v. Green* (1979), 74 Ill. 2d 444, 453.) The criterion for the application of the plain error rule in criminal cases is whether the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing. *People v. Mack* (1984), 105 Ill. 2d 103, 125; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83.

Even if the comments complained of here were considered to be improper, they are not so substantial as to rise to the level of plain error. First, we do not believe the remarks denied the defendant a fair and impartial trial. Second, in our judgment, the verdict in this case would not have been different had the allegedly improper remarks not been made. Because the prosecutor's remarks neither impugned the integrity of the judicial process nor subjected this defendant to a miscarriage of justice, we see no justification for dispensing with the general waiver rule under these facts. We therefore reject the defendant's third assignment of error.

The fourth assignment of error we address with respect to the guilt phase of the trial concerns the sufficiency of the evidence, which, under the *Enoch* holding, we may consider, even though no post-trial motion was filed. The defendant contends that the foregoing evidence was insufficient for the jury to find him guilty beyond a reasonable doubt of murder. The defendant argues that his conviction was procured on the uncorroborated testimony of three accomplice witnesses. The defendant also argues that the prosecution witnesses lacked credibility and therefore were not worthy of belief.

The testimony of an accomplice witness "has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice towards the accused, fear, threats, promises or hopes of leniency,

or benefits from the prosecution." (*People v. Hermens* (1955), 5 Ill. 2d 277, 285.) Because it is attended with serious infirmities, accomplice testimony "should therefore be accepted only with utmost caution and suspicion and have the absolute conviction of its truth." (*People v. Newell* (1984), 103 Ill. 2d 465, 470.) While we recognize that such testimony is subject to careful scrutiny, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction *if it convinces the jury of the defendant's guilt beyond a reasonable doubt. People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. George* (1971), 49 Ill. 2d 372, 382; *People v. Nastasio* (1963), 30 Ill. 2d 51, 55.

The due process clause of the fourteenth amendment (U.S. Const., amend. XIV) protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged. (*In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1078.) When presented with a challenge to the sufficiency of the evidence, it is this court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses. If, after such consideration, this court is of the opinion that the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged, then the conviction must be reversed. *People v. Bartall* (1983), 98 Ill. 2d 294, 306; *People v. Jefferson* (1962), 24 Ill. 2d 398, 402.

In *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, the United States Supreme Court offered guidance for reviewing courts confronted with challenges to the sufficiency of the evidence. The Court articulated the proper standard of review to be

applied when a defendant claims he has been convicted in the State court upon insufficient evidence:

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence is to be considered in the light most favorable to the prosecution.* The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." (Emphasis added.) 443 U.S. at 318-19, 61 L. Ed. 2d at 573-74, 99 S. Ct. at 2788-89.

A careful review of the record *in the light most favorable to the prosecution* convinces us that a rational fact finder readily could have found the defendant guilty of murder beyond a reasonable doubt. Unlike the cases relied upon by defense counsel, the instant case does not involve uncorroborated accomplice testimony given in exchange for immunity and contradicted by apparently equally credible accomplices. Here, significant physical evidence corroborates the testimony of the State's witnesses. A pair of blue shorts bearing the defendant's institutional identification number was found in the corner

of the shower area near the victim. Bloodstains on the shorts matched the victim's blood type. This physical evidence corroborates the testimony of Joe Williams and Bruce Dawkins that the defendant participated in the stabbing of the victim and then removed his bloodstained clothing. It also corroborates the testimony of Paul Williams that when the defendant emerged from the washroom after the incident he was wearing a different set of clothing.

Not only does this undisputed physical evidence corroborate the testimony of the State's witnesses, but it also substantially contradicts the testimony of codefendant Amos that neither he nor the defendant stabbed the victim. A review of the testimony of Robert Amos reveals that he did not testify that the defendant had physical contact with the victim after the stabbing began or that the defendant removed any of his clothing while in the washroom. Amos' testimony offered no explanation as to how the defendant's shorts were bloodied or why the shorts were left behind in the washroom. In our judgment, the testimony as well as the physical evidence supports the verdict of guilty.

The defendant further challenges the sufficiency of the evidence on the grounds that the testimony of the State's witnesses was inherently "incredible" and thus unworthy of belief. The defendant attacks the credibility of Joe Williams, Paul Williams, and Bruce Dawkins in that they admitted participation in the crime and, therefore, as accomplices had a motive to lie in order to procure leniency with regard to their own involvement; their testimony was impeached by evidence of prior felony convictions indicative of dishonesty; they made statements to investigators after the incident which were inconsistent with their trial testimony; their testimony conflicted with respect to who was present, who performed acts of strangulation, and how the weapons

were brought into the washroom; their testimony was directly contradicted by codefendant Amos; Joe Williams was an admitted heroin addict; and Paul Williams and Joe Williams were motivated to testify falsely against the defendant because of rivalries for the Vice Lords' leadership in cellhouse B-East.

Although Joe Williams, Paul Williams, and Bruce Dawkins were accomplices, any infirmities in their testimony go to the questions of the weight of the evidence and their credibility as witnesses. (*People v. Hansen* (1963), 28 Ill. 2d 322, 332; *People v. Todaro* (1958), 14 Ill. 2d 594, 602.) It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Titone* (1986), 115 Ill. 2d 413, 422; *People v. Lindgren* (1980), 79 Ill. 2d 129, 143; *People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Akis* (1976), 63 Ill. 2d 296, 298-99.) It is also peculiarly within the province of the jury to resolve any conflicts in the evidence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468; *People v. Lewis* (1981), 88 Ill. 2d 129, 151-53.) This court therefore will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses (*People v. Manion* (1977), 67 Ill. 2d 564, 578-79; *People v. Novotny* (1968), 41 Ill. 2d 401), and will not reverse a criminal conviction *unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt* (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360; *People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Newell* (1984), 103 Ill. 2d 465, 470; *People v. Yates* (1983), 98 Ill. 2d 502, 518-19).

The jury in the present case was fully cognizant of the infirmities in the testimony of the State's witnesses. The jury was aware of their respective criminal backgrounds and knew of their respective plea agreements

with the State. The jury was fully instructed that accomplice testimony was subject to suspicion, and should therefore be viewed with caution. (See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (IPI Criminal 2d).) The jury also could properly consider that the testimony of codefendant Robert Amos was not without its own infirmities and improbabilities. It was thus the jury's function to draw conclusions based on the evidence and to decide whether there was a reasonable doubt as to the defendant's guilt.

We believe the jury was justified in choosing to believe the testimony of the State's witnesses over the testimony of codefendant Amos. While discrepancies existed in the evidence, we cannot say that the jury's conclusion was so unreasonable, improbable, or so unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360-61; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Accordingly, the defendant's contention that the evidence was insufficient to establish his guilt beyond a reasonable doubt is without merit.

We next consider allegations of error at the sentencing proceeding. Prior to the second phase of the defendant's sentencing hearing, defense counsel made a motion *in limine* to preclude the State from introducing evidence of the defendant's alleged involvement in the 1978 murder of Joseph Kendrick and the attempted murder of Richard Soothy. The defense argued that the evidence was unreliable because the defendant was never convicted. The court denied the motion. The defendant now contends that the circuit court erred by allowing in aggravation this unreliable hearsay testimony.

Chicago police officer Thomas Brankin testified that he investigated a homicide in the south side apartment of Joseph Kendrick and Richard Soothy on March 7, 1978. Brankin stated that he took a statement from

Richard Soothy. Soothy told him that he was in his room when he heard a shot, the shot which apparently killed Kendrick. Two men then entered Soothy's room. One of the intruders straddled his chest,· while the other tied him up. A robe was then placed over Soothy's head. Soothy, however, recognized the defendant. The defendant stabbed, robbed, and then shot Soothy twice in the head. Following his arrest, the defendant made an oral statement in which he admitted to standing in the doorway of the apartment while an accomplice committed the attacks. On cross-examination, Brankin testified that both Kendrick and Soothy were narcotic addicts. Further cross-examination revealed the defendant had been indicted for the murder of Kendrick, but the charges were dropped when Soothy became unavailable to testify.

The first phase of a bifurcated sentencing hearing deals solely with the question of whether the defendant is eligible to receive the death penalty. If the State proves beyond a reasonable doubt one of the eight enumerated statutory aggravating factors *and* that the defendant had attained the age of 18 when he committed the offense (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)), then the cause proceeds to the second, or aggravation/ mitigation, phase. During this second phase, the trier of fact weighs the aggravating and mitigating factors to determine whether the defendant will be sentenced to death. Section 9—1(e) of the Code of Criminal Procedure of 1963 allows for the introduction of evidence during the second phase of the sentencing hearing regardless of whether it would be admissible during the guilt phase of the trial. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e).) The only limitation upon evidence to be admitted at the aggravation and mitigation phase of the sentencing hearing is that the evidence be *reliable* and *relevant* (*People v. Hall* (1986), 114 Ill. 2d 376, 416; *People v. Collins* (1985), 106 Ill. 2d 237, 282; *People v. Stewart* (1984), 105

Ill. 2d 22, 67; *People v. Free* (1983), 94 Ill. 2d 378, 422), the determination of which lies within the sound discretion of the trial judge (*People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Davis* (1983), 95 Ill. 2d 1, 43). The fact that the evidence presented contains hearsay does not make it *per se* objectionable (*People v. Perez* (1985), 108 Ill. 2d 70, 86-87; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365), nor does it deny the defendant his right to confront witnesses (*People v. Lyles* (1985), 106 Ill. 2d 373, 416; *People v. Davis* (1983), 95 Ill. 2d 1, 47). Hearsay evidence of crimes that did not result in prosecution or conviction is therefore admissible at the aggravation and mitigation phase if it meets the requirements of relevancy and reliability. See *People v. Collins* (1985), 106 Ill. 2d 237, 282; *People v. Ruiz* (1982), 94 Ill. 2d 245, 267-68; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.

Given the facts that the defendant was identified by Richard Soothy and that Soothy's identification was corroborated by the defendant's admission that he was present at the scene (see *People v. Brisbon* (1985), 106 Ill. 2d 342, 364-65), we are unable to conclude that the trial judge abused his discretion in finding the testimony to be *reliable*.

Although this issue was not preserved by the filing of a post-trial motion, we felt compelled to consider it to determine whether the alleged error constitutes plain error, so as to avoid the waiver rule announced in *People v. Enoch.* In the process of determining that this issue does not constitute plain error, it was necessary to consider its merits. Also, with regard to the next argument, in order to determine whether the issue was waived by failure to raise it in a post-trial motion, we must again consider the contention in some detail.

The defendant asserts additional error during the closing arguments of his sentencing hearing. The defend-

ant points to three comments he believes were improper and prejudicial. The defendant maintains that these comments constitute reversible error and warrant granting him a new sentencing hearing.

First, in reference to the defendant's prior criminal background, the prosecution argued:

> "Finally, Ladies and Gentlemen, I would ask you to consider what disposition or penalty can be imposed to justly address this crime of murder that the Defendant has committed. Prison has not proven effective. Ask yourself is society defenseless to prevent and to protect itself from a murderer such as the Defendant, Mr. Young.
>
> I would argue no, that capital punishment has been provided by our society and is available and necessary to protect our society from this man who has proven to be a killer time after time."

Defense counsel maintains that the prosecution's allusion to society's need to protect itself from the defendant unfairly appealed to the jury's fears and prejudices because it implied that the defendant, if sentenced to imprisonment, would eventually be released to menace the community again.

Second, in rebuttal to defense counsel's closing arguments, the prosecutor maintained:

> "And the sentencing procedure, as you can see in the (c) phase, the instructions that you will receive, there is no burden of proof. Beyond a reasonable doubt is no longer with us. You must decide this issue, each and every one of you and totally as a group. There is no more presumption of innocence as to Mr. Young on the murder of Brian Jackson or as to any of the crimes to which he had already been convicted in his previous criminal history, that is gone.
>
> Mr. Young does not sit before you there presumed to be innocent of any of the things to which you have heard as to his criminal background and those convictions."

Because some of his prior criminal acts had not resulted in convictions, the defendant claims that the prosecutor's remark that he was not "presumed to be innocent" of those offenses was prejudicial error.

The final comment the defendant regards as prejudicial occurred during his opening statement when defense counsel informed the jury:

> "Mr. Young is presently serving forty years at Stateville for the commission of a murder. You will be presented evidence that is going to show you his out date on that murder is September of 1999.
>
> \* \* \*
>
> So if you come back with a decision which the death penalty should not be imposed, you can be assured that the sentence will be imposed by the Judge, and it will extend from that 1999 out date that he presently has."

In closing argument, defense counsel reiterated:

> "Remember, though, if you decide not to impose the death penalty, that Mr. Young is not going free, that he will be spending a good portion of his life, remainder of his life in prison, if not all of it. His out date is now '99. And under the law, any sentence he receives in this case will extend past that particular year. He is not going to go free if you recommend that the death penalty not be imposed."

The thrust of defense counsel's closing argument was to reassure the jury that if they did not impose a death sentence, then the defendant would receive another prison sentence which would run consecutively to the one he was currently serving. The defendant's counsel on appeal, however, now maintains that this inaccurate statement misled the jury to believe that the defendant might be sentenced to a term of years and eventually be eligible for parole.

The State points out that the defendant failed to object at the sentencing hearing to the remarks he now complains of and did not include them as an issue in a

written post-trial motion. The plain error doctrine may be invoked where the evidence is closely balanced or the error alleged is so egregious that a fair and impartial trial or sentencing hearing could not be had. (See *People v. Holman* (1983), 103 Ill. 2d 133, 175-76; *People v. Szabo* (1983), 94 Ill. 2d 327, 354-55; 107 Ill. 2d R. 615(a).) However, after considering the record and the context in which those statements were made, we cannot say the remarks were of such a nature that either of these standards was met.

The defendant also asserts error in the court's instructions to the jury. The first instance the defendant complains of occurred during the first phase of the sentencing hearing. The circuit court instructed the jury that if they found the defendant ineligible for the death penalty, then he would be sentenced by the court to a "term of imprisonment." (See IPI Criminal 2d No. 7A.09.) The second instance occurred during the second phase of the sentencing hearing where the jury was instructed that the defendant would be sentenced to "imprisonment if he were not sentenced to death." (See IPI Criminal 2d No. 7A.15.) The third instance the defendant complains of, which also occurred during the second phase of the sentencing hearing, concerns the instruction that during its deliberations on whether to impose the death penalty, "[n]either sympathy nor prejudice should influence [the jury]." See IPI Criminal 2d No. 1.01(5).

The defendant contends that the instructions mentioning "imprisonment" or a "term of imprisonment" should have been omitted. The defendant further argues that the circuit court erred in not informing the jury that, if not sentenced to death, he could receive only a sentence of life imprisonment without the possibility of parole. The defendant also maintains that the circuit court's admonition not to consider sympathy undermined his strategy at the sentencing hearing. Defendant argues

that the jury should have considered sympathy as a mitigating factor against the imposition of the death penalty.

We note first that the defendant failed to object to the instructions at the jury-instruction conference. Second, the defendant did not request a "sympathy" instruction or an instruction setting forth the range of sentences that may be imposed on one convicted of murder and, by tendering it, preserve the request for the record. Third, the defendant failed to raise the issue in a written post-trial motion. Under our holding in *People v. Enoch*, the defendant is therefore precluded from now assigning these instructions as error.

The instructions given did not violate constitutional rights or involve plain error. The form of the instructions given was proper. In *People v. Stewart* (1984), 104 Ill. 2d 463, 493-94, this court upheld, under the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV), an instruction which directed the jury not to be governed by sympathy in its deliberations on whether to impose the death penalty. In *People v. Albanese* (1984), 102 Ill. 2d 54, 81, this court upheld a jury instruction stating that the alternative to the death penalty was "imprisonment." Later, however, in *People v. Gacho* (1988), 122 Ill. 2d 221, 262, this court held that in cases involving multiple murders, an instruction should be given that if the jury finds mitigating factors sufficient to preclude the imposition of the death penalty, the defendant will be sentenced to natural life imprisonment and no person serving such a sentence can be paroled or released except through executive clemency. This court acknowledged that this holding differed from what was said in *Albanese*, and directed that this holding be applicable only in sentencing hearings involving defendants convicted of multiple murders conducted after the date of the *Gacho* opinion (February 11, 1988). The holding in *Gacho* does not apply to this case.

The remainder of the defendant's arguments are general constitutional challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1). The defendant maintains that the death penalty statute violates the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV) because it does not require the sentencing authority to find that death is an appropriate punishment. The defendant also maintains that the death penalty statute, in vesting the sentencing authority with unlimited, undefined discretion to consider nonstatutory aggravating factors, results in an arbitrary and capricious imposition of the death penalty in violation of the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). Recognizing that we have rejected the same arguments in *People v. Neal* (1985), 111 Ill. 2d 180, 202-03, *People v. Perez* (1985), 108 Ill. 2d 70, 96-98, *People v. Stewart* (1984), 105 Ill. 2d 22, 75-77, and *People v. Williams* (1983), 97 Ill. 2d 252, 266, the defendant, nevertheless, urges us to reconsider our decisions in those cases. The defendant, however, offers no new or compelling arguments for overruling those decisions and we decline to do so.

Two other arguments advanced by the defendant have been rejected by this court. This court has determined that the death penalty statute does not violate the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV) because it fails to establish an adequate procedure to allow a comparative review of capital cases to determine whether the death penalty is being disproportionately applied. (*People v. Hall* (1986), 114 Ill. 2d 376, 420; *People v. Walker* (1985), 109 Ill. 2d 484, 508; *People v. Collins* (1985), 106 Ill. 2d 237, 285; *People v. Mack* (1984), 105 Ill. 2d 103, 133-34; *People v. Kubat* (1983), 94 Ill. 2d 437, 504; see also *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871; *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d

929, 941, 96 S. Ct. 2950, 2958.) This court has also concluded that the standardless discretion vested in the prosecutor to determine whether to request a death penalty hearing does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Albanese* (1984), 104 Ill. 2d 504, 542; *People v. Szabo* (1983), 94 Ill. 2d 327, 351; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 539.) The defendant gives us no persuasive reason to reconsider those decisions. We thus continue to adhere to our prior rulings.

The defendant challenges the death penalty statute in three other respects. First, the defendant maintains that the constitutional requirement of adequate appellate review mandates the submission of written findings of fact as the grounds for a sentence of death. We addressed this issue in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 443-44, *People v. Stewart* (1984), 104 Ill. 2d 463, 496, and *People v. Gaines* (1981), 88 Ill. 2d 342, 384, and in those cases we concluded that such findings were not required. Second, the defendant contends that the death penalty statute unconstitutionally places on the defendant the burden of proving that the death penalty is inappropriate. This contention was rejected by this court in *People v. Del Vecchio* (1985), 105 Ill. 2d 425, 446, *People v. Caballero* (1984), 102 Ill. 2d 23, 49, and *People v. Williams* (1983), 97 Ill. 2d 252, 302. Finally, the defendant argues that the statute is unconstitutional because it fails to require the State to prove beyond a reasonable doubt the absence or nonexistence of mitigating factors sufficient to preclude imposition of the death penalty. We have previously considered and rejected this argument in *People v. King* (1986), 109 Ill. 2d 514, 546, *People v. Perez* (1985), 108 Ill. 2d 70, 96, *People v. Madej* (1984), 106 Ill. 2d 201, 211, and *People v. Davis* (1983), 95 Ill. 2d 1, 28.

The defendant further challenges the constitutionality of the death penalty statute, contending that the statute selectively and arbitrarily limits the application of the death sentence to individuals who do not require special provisions or assistance in order to be fit to stand trial.

Section 104—22 of the Code of Criminal Procedure of 1963 provides in pertinent part:

"(a) On motion of the defendant, the State or on the court's own motion, the court shall determine whether special provisions or assistance will render the defendant fit to stand trial as defined in Section 104—10.

(b) Such special provisions or assistance may include but are not limited to:

(1) Appointment of qualified translators who shall simultaneously translate all testimony at trial into language understood by the defendant.

(2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney." (Ill. Rev. Stat. 1981, ch. 38, par. 104—22.)

Section 104—26(b) provides that a person who is convicted following a trial under section 104—22 shall not be eligible for the death penalty. (Ill. Rev. Stat. 1981, ch. 38, par. 104—26(b).) Pursuant to section 104—10, a person is unfit to stand trial "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." (Ill. Rev. Stat. 1981, ch. 38, par. 104—10.) Citing *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, as support for his position, defendant argues that this distinction between persons who do and persons who do not require special provisions or assistance to be fit to stand trial is selective and arbitrary.

We considered a related argument in *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502. In that case,

this court determined, contrary to the defendant's complaint, that the death penalty statute does not make English-speaking defendants subject to the death penalty while exempting defendants unable to speak English who, under section 104—22, require assistance to understand the trial proceeding. The court reasoned that the term "physical or mental condition," as used in section 104—10, was not intended by the legislature to include an inability to speak or to understand English. (104 Ill. 2d at 502.) The conclusion reached in *Stewart* was upheld in *People v. Johnson* (1986), 114 Ill. 2d 170, 208, *People v. Neal* (1985), 111 Ill. 2d 180, 202, *People v. Perez* (1985), 108 Ill. 2d 70, 94-95, and *People v. Madej* (1985), 106 Ill. 2d 201, 212. The defendant, however, does not ask us to reconsider our decision in *Stewart*. Rather, the defendant maintains that the statute is unconstitutional because it exempts persons who require "communication by way of sign language, tactile-sense recognition and similar avenues." The defendant asserts that while we recognized this exemption in *Stewart* and *Perez*, those opinions did not address its constitutionality.

We find the defendant's argument unconvincing. Article 104 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—10 *et seq.*) was enacted by the legislature "to fill 'the glaring gap in the present statutory framework of our criminal justice system as it relates to unfit defendants' [citation] by rendering the defendant fit to stand trial through assistance or by requiring a hearing to ascertain the defendant's fitness and indicated future treatment for him." *People v. Stewart* (1984), 104 Ill. 2d 463, 501.

The argument presented here is but another twist to the arguments that have been heretofore presented by defendants in the cases discussed above. Those arguments centered on the English-speaking and non-En-

glish-speaking defendants. The argument now before us focuses on those defendants who are capable of oral communication as against those who are not. This court has never defined the breadth of the exemption from the death penalty granted by section 104—26(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 104—26(b)). In *Stewart*, this court stated, without deciding the issue, that it would appear the exemption of section 104—26(b) would include cases wherein the communication with the defendant was "by way of sign language, tactile-sense recognition and similar avenues." *Stewart*, 104 Ill. 2d 463, 502.

As noted in *Stewart*, article 104 addresses the question of defendant's fitness to stand trial. Section 104—22 provides for special communicative assistance which would enable an accused, who otherwise would be unfit to stand trial, to comprehend the proceedings and to take part in the preparation of a defense. Also, as noted in *Stewart*, article 104 was enacted to deal with a particular type of disability which confronted the authorities in dealing with Donald Lang (see *People v. Lang* (1979), 76 Ill. 2d 311), an illiterate deaf-mute accused of two murders who, although not in need of mental treatment, had virtually no ability to communicate with others in any recognized language system. *People v. Stewart* (1984), 104 Ill. 2d 463, 500-01.

The reasoning supporting the exemption from the death penalty for those who are so extensively impaired is that the special assistance afforded in section 104—22 may not be sufficiently reliable or effective to accommodate the complexities of the guilt phase and the bifurcated sentencing phases of the trial of a capital case. We find this to be a legitimate concern and the exemption for defendants so afflicted is not an arbitrary or an unreasonable classification. The class of defendants who are impaired to this extent who will be exempt from the

death penalty under section 104—26(b) will, of necessity, be small. Accordingly, we decline to hold our statute unconstitutional for the reason urged.

Finally, the defendant, in his supplemental brief, contends that the death penalty statute is unconstitutional because it fails to adequately narrow, to a unique and cognizable group, those defendants eligible to be sentenced to death as opposed to those defendants found guilty of murder. The defendant relies on the constitutional principle developed in *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733, and *Godfrey v. Georgia* (1983), 446 U.S. 420, 64 L. Ed. 2d 389, 100 S. Ct. 1759, that death penalty statutes must sufficiently narrow, to a wholly unique group, the class of criminal defendants convicted of murder who are eligible for the death penalty. Because the same aggravating factors which qualify a defendant for the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)) also qualify him for natural life imprisonment (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)), the defendant argues that there is no reasonable justification between the potential imposition of death on any particular defendant and all others found guilty of murder.

We do not agree with defendant's contention. First, the Illinois statute narrows the class of murderers subject to capital punishment by specifying eight statutory aggravating circumstances, one of which must be found by the jury to exist before a death sentence can ever be imposed. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b).) In addition, the jury is authorized to consider any other relevant aggravating or mitigating circumstances. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c).) These procedures require the jury to objectively consider the nature or circumstances of the crime *and* the character or record of the individual defendant before it can impose a sentence of death. Because our statutory scheme pro-

vides for categorical narrowing at the first stage of the sentencing hearing, and for individualized determination at the second stage, there is not disparity in the treatment of defendants convicted of murder in Illinois. (See *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733; *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960.) Second, amending our statute, as defendant's argument suggests, to apply automatically to every defendant convicted of murder who meets the standards set forth for death eligibility would be unconstitutional. Such a system would have the vices of the mandatory death penalty statutes struck down in *Roberts v. Louisiana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001, and *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978. We therefore find no merit in this argument.

For the reasons set forth above, we hold that the defendant's conviction and sentence for murder is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 9, 1989, as the date on which the sentence of death, entered in the circuit court of Will County, is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

STAMOS and CALVO, JJ., took no part in the consideration or decision of this case.