NOTICE
Decision filed 07/09/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230710-U

NO. 5-23-0710

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Pope County. |
| | ) | |
| v. | ) | No. 22-CF-15 |
| | ) | |
| MATTHEW FERRELL, | ) | Honorable |
| | ) | Carey C. Gill, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Moore* and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's convictions where the evidence was sufficient to sustain his convictions, and trial counsel was not ineffective for failing to impeach witnesses with their prior statements.

¶ 2    Following a bench trial, defendant, Matthew Ferrell, was convicted of three counts of criminal sexual assault and one count of unlawful delivery of alcohol to a minor. On direct appeal, first, with regard to the criminal sexual assault charges, defendant contends that the State did not prove him guilty beyond a reasonable doubt. Defendant does not challenge the sufficiency of the evidence supporting the unlawful delivery of alcohol to a minor charge. Defendant next argues

---

*This case was originally assigned to Justice Welch. For administrative reasons Justice Moore has been substituted on the panel for Justice Welch. Justice Moore has read the briefs in this case and has listened to the recording of oral argument.

1

that trial counsel was ineffective for failing to impeach the State's witnesses with their prior inconsistent statements. For the reasons that follow, we affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4    This recitation of the facts includes only those facts necessary to resolve this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties.

¶ 5    On March 25, 2022, defendant was charged by information with three counts of criminal sexual assault. Count I alleged that defendant committed an act of sexual penetration in that he placed his penis in the mouth of T.A.F. (T.F.) (D.O.B. 01/24/05), a family member under 18 years of age, in violation of section 11-1.20(a)(3) of the Criminal Code of 2012 (Code). 720 ILCS 5/11-1.20(a)(3) (West 2020). Counts II and III alleged that defendant committed acts of sexual penetration in that he placed his penis in the anus and mouth, respectively, of C.L.B. (C.B.) (D.O.B. 08/13/2006[1]), and that C.B. was unable to give knowing consent, in violation of section 11-1.20(a)(2) of the Code. *Id.* § 11-1.20(a)(2). Counts I, II, and III were Class 1 felonies. Count IV alleged that defendant committed the offense of unlawful delivery of alcohol to a minor, a Class A misdemeanor, in that he provided both T.F. and C.B. with alcohol, knowing that they were under the age of 21, in violation of section 6-16(a)(iii) of the Liquor Control Act of 1934. 235 ILCS 5/6-16(a)(iii) (West 2020).

¶ 6    On August 15, 2022, defendant waived his right to a jury trial. The matter proceeded to a bench trial on April 19, 2023. T.F. was the State's first witness. T.F. testified that at the time of the alleged conduct, he was 16 years old. He lived in an apartment in Golconda, Illinois, with his

_____

[1]The charging document erroneously listed C.B.'s date of birth as October 17, 2006. This was corrected, without objection, during trial.

grandmother, Gloria Ingle, and two younger cousins. Defendant was his uncle, and lived in the apartment across from the apartment where T.F. lived with his grandmother and cousins. During the pertinent time frame, T.F. spent time at his uncle's apartment. During those visits, defendant often gave him alcohol, specifically vodka and whiskey. T.F. testified that defendant never provided him with beer, and that beer was not available in the apartment.

¶ 7    T.F. also testified that "sexual stuff" sometimes occurred during his visits with defendant. When asked to describe the sexual activity, T.F. testified that "[u]sually it was he would have me give him a blow job." T.F. also testified that nothing else happened. The sexual conduct "[m]ost likely" happened more than five times. When asked what would lead up to the sexual abuse, T.F. testified that "[i]t would usually proceed with me joking around, getting on a porn site and then it would arouse him and he would ask me to give him a blow job and I did." When asked if defendant's penis ever entered his mouth, T.F. replied, "Yes, sir." T.F. testified that the sexual acts sometimes occurred in the bathroom, sometimes in the living room, and he believed it happened once in the kitchen. Although T.F. admitted that he had been drinking when these acts occurred, he denied that he was drunk. According to his testimony, defendant never ejaculated during these acts. Afterwards, T.F. would usually go home and go to bed. No one witnessed T.F. performing oral sex on defendant, and he never reported it to anyone.

¶ 8    T.F. testified that he was best friends with C.B., and that he introduced C.B. and defendant. When the three of them were together, they would usually "drink alcohol and play poker or listen to loud music." Like with T.F., defendant also provided alcohol, including beer, to C.B. T.F. never witnessed defendant and C.B. engaged in sexual activity. T.F. also testified that A.B. was his ex-girlfriend, but that they were dating during the pertinent time period. T.F. moved out of his

grandmother's home and started living with A.B. on the day he first disclosed the abuse. He never saw defendant provide alcohol to A.B.

¶ 9    Turning T.F.'s attention to January 13, 2022, the State asked T.F. about the event leading up to his disclosure of the abuse, first to his high school principal, Seth Graves, then to the Pope County Sheriff, Jerry Suits. In response to a question from the prosecutor, T.F. testified that he "believe[d]" defendant performed oral sex on T.F. T.F. testified that the day before the disclosure, he went to the Dollar General store in Golconda with defendant, C.B., and A.B. They were in defendant's car. T.F. drove, A.B. was the front seat passenger, C.B. and defendant were in the back seat. T.F. testified that he witnessed defendant touching and trying to kiss C.B., and that C.B. kept telling defendant to stop. T.F. believed he saw defendant touching C.B.'s face and added that "[t]here could have been more but that was so long ago." T.F. testified that defendant became angry, exited the car, and started walking towards the apartments.

¶ 10    On cross-examination, T.F. admitted that he argued with his grandmother and defendant about him staying at A.B.'s home. T.F. "believed" that a fight he had with defendant over him staying at A.B.'s was "pretty significant," and admitted that he disclosed these allegations the very next day. T.F. admitted that, because he wanted to go stay with A.B., he "got what he wanted" after the disclosure, but denied making the allegations in order to get his way. T.F. testified that he discussed moving in with A.B. on the school bus with her and C.B. T.F. also testified that he, A.B., and her mother had been discussing his living with them "for a long period of time," and that his grandmother was opposed to the idea.

¶ 11    T.F. also admitted, during cross-examination, to being involved in a sexual relationship with an adult woman prior to his turning 18 years old. The adult woman provided T.F., and sometimes C.B., with alcohol. T.F. testified that he got alcohol from "thousands of places"; he

4

"would just take alcohol whenever it was available to [him]." T.F. never disclosed this sexual abuse to the authorities.

¶ 12   T.F. testified he and C.B. would get drunk and walk around town. C.B. also visited T.F.'s home and helped T.F. with his chores. T.F. testified that C.B. would help with chores "roughly 65 percent of the time" if T.F. asked for assistance. T.F. denied ever telling C.B. to do his chores. T.F. also told trial counsel that he had not disclosed the allegations of abuse to anyone, including C.B. T.F. then testified that he thought he told some of his friends, but that he had not told anyone who then, in turn, notified the authorities.

¶ 13   On redirect, T.F. testified that when he was with defendant, T.F. would sometimes pour himself a glass of alcohol, other times defendant would pour the alcohol. In clarifying his earlier testimony that defendant never kept beer in the apartment, but that defendant provided C.B. with beer, T.F. explained that defendant did not keep beer at his place, but that defendant would go down to the gas station and buy beer.

¶ 14   T.F. also testified that he did not report the sexual abuse earlier "[b]ecause [he] didn't want to report it if [C.B.] was not going to comply." T.F. explained that he "was scared that if I was to have went [*sic*] and told, that [C.B.] would have pretended that none of it happened." T.F. was afraid of being the lone accuser. T.F. also confirmed that the conversation that took place on the bus prior to the disclosure was about telling the authorities, and he did not report the sexual abuse so that he could go live with his girlfriend, A.B.

¶ 15   The State also tried to have T.F. clarify that he testified on direct examination that he had not told anyone about the abuse, but then during cross-examination, he said that he told some of his friends. T.F. testified that he could not recall who he told about the abuse, but that he told C.B.,

5

A.B. and her mother, his principal, and the sheriff. A.B. and her mother encouraged T.F. to report the abuse to the authorities.

¶ 16    The State called C.B. as a witness. C.B. met T.F. through school; T.F. introduced defendant to C.B. During the relevant time frame, C.B. and A.B. were good friends; they dated from the first through the fifth grades. C.B. and T.F. sometimes visited defendant in his apartment, and sometimes C.B. visited defendant alone. They would "drink a little bit, usually listen to music, play some cards, just relax." C.B. would drink beer and cheap whiskey. C.B. testified that he often got drunk at defendant's apartment, and that defendant would have his way with C.B., meaning "fucking" him, although it was usually just C.B. performing oral sex on defendant. Defendant's penis would be in C.B.'s mouth; sometimes defendant would ejaculate in C.B.'s mouth. Other times it was anal sex, and defendant would place his penis in C.B.'s anus.

¶ 17    In response to questions about the trip to the Dollar General store, C.B. testified that he and defendant were in the back seat of the car, A.B. and T.F. were in the front seat. During one trip, defendant tried grabbing C.B.'s penis; C.B. kept pushing defendant's hand away. Defendant got angry and got out of the vehicle. C.B. thought defendant walked back to the apartment.

¶ 18    C.B. testified that, prior to the January 13, 2022, disclosure, he had not told anyone what defendant was doing to him, although he also testified that "[T.B.] like already knew what was kind of going on and so told [A.B.] and both decided to go and tell [the principal]." When asked if he spoke with anyone in law enforcement, C.B. answered, "Orville, my bus driver." He thought he spoke with Sheriff Suits the same day. C.B. testified that he did not have motive for reporting the abuse, and no motives were discussed on the school bus that morning. C.B. said, "We did this so he can go away in jail and get him out of here."

6

¶ 19    On cross-examination, C.B. testified that he and T.F. were close friends in late 2021. They would spend time together at T.F.'s apartment. If T.F. asked for help, C.B. would lend a hand. T.F. provided C.B. with emotional support by being a really good friend. If T.F. needed cash, C.B. would give him money. Sometimes C.B. got his alcohol from defendant or he would steal it; other times he would pay people to give him alcohol.

¶ 20    C.B. told defense counsel that T.F. snuck out of his house to stay with A.B. T.F.'s grandmother did not like it. C.B. testified that T.F. spoke of moving out of his grandmother's apartment; he wanted to get away from her. C.B. described T.F.'s grandmother as being "naggy" and a "stuck up bitch." T.F., his grandmother, and defendant had an argument the night before the disclosure of the abuse. C.B. did not know what the argument was about, as he left before the argument escalated. C.B. testified that A.B. previously asked him if he thought that T.F. moving in with her was a good idea.

¶ 21    C.B. reiterated that he had not told anyone about the sexual abuse. T.F. knew about the abuse, and C.B. just figured that someone else told T.F. T.F. brought it up on the bus on the day of the disclosure. T.F. and A.B. asked C.B. if he wanted to make the allegations. C.B. testified that he wanted to "leave it be." He decided to disclose the abuse because "they had a point" for telling the authorities, so C.B. "went with it." T.F. did not tell him what to say. T.F. "told me, we—want to tell [the principal] what was going on, so we need you because he done it to you as well, so you want to do it with us. At first I wasn't going, going with it, but then he made a good point, so I did. I just winged it." C.B. did not recall what he told his principal, the bus driver, or the police because he was "just winging it."

¶ 22    On redirect, C.B. explained that T.F. told him what defendant had been doing to him (T.F.), and T.F. told him that he knew defendant was doing it to C.B. as well. C.B. wanted to forget the

7

abuse had ever happened and pretend it never existed. C.B. testified that he did not have the "balls" to come forward and that he was afraid that it would escalate. T.F. and A.B. talked about all the bad things defendant had done to T.F. and C.B. and gave a "good little speech" about how "fucked up it was," so C.B. "went with it," meaning that is when he decided to tell the authorities what had happened to him. T.F. did not tell him what to say to the authorities. On recross, C.B. stated that "if I could have made it up, I wouldn't because I have a lot of pride, so I won't lie about this."

¶ 23    A.B. testified that T.F. was her former boyfriend, and that C.B. was her best friend. She met defendant through T.F. A.B. testified that she, T.F., C.B., and defendant all hung out together on one or two occasions. On the day of the trip to the Dollar General store, T.F. was driving, she was in the front passenger seat, and defendant and C.B. were in the back seat. While T.F. was in the store, A.B. observed defendant "grabbing [C.B.]'s inner thigh near his private areas." She stated C.B. appeared very uncomfortable and told defendant to stop several times. When T.F. exited the store, A.B. got out of the car and told him what she saw. As the group exited the parking lot, defendant angrily asked to be let out of the car and then walked away. A.B. told her mother what she witnessed.

¶ 24    The next morning, A.B., T.F., and C.B. discussed reporting defendant's behavior to the authorities. Initially, T.F. did not seem sure of the idea. C.B. sat quietly with his head hung. A.B. thought it was important that the boys report it because it was wrong. As a result of the disclosure, T.F. moved in with A.B. and her mother. The three of them discussed the arrangement before the disclosure. Insofar as the disclosure itself was concerned, A.B., T.F., and C.B. did not discuss the possibility of T.F. moving in with her as a motive for the reporting.

¶ 25    On cross-examination, A.B. stated that she only saw defendant touch C.B.'s leg, not his crotch, his arm, or his face. In response to the question, "So [T.F.] did not witness [defendant]

touch [C.B.] at all?" A.B. answered, "No, ma'am." A.B. testified that she neither recalled telling anyone in law enforcement about what happened nor sending the sheriff's department an email about it. She did confirm her email address. Without showing an email to A.B., defense counsel asked, "So there wouldn't be a reason that I would have an e-mail that would suggest or state that [T.F.], [C.B.] and I were talking and then out of nowhere [C.B.] was silent; you did not send an email with that phrase?" A.B. answered, "I do not remember sending that, ma'am." A.B. reported the Dollar General store incident to her mother the same day.

¶ 26    According to A.B., there was no discussion about T.F. coming to live with her and her mother during the bus ride to school the next morning. A.B. stated that they had not discussed T.F. coming to live with her until after the disclosure. A.B. thought T.F. came to stay with them not the day of the disclosure, but the following day.

¶ 27    On redirect, A.B. affirmed that she had not reported anything to the sheriff's department and further stated that she did not know how the sheriff's department would have her information. She also clarified that she and T.F. never discussed what he may or may not have seen after he got back into the vehicle at the Dollar General store. On re-cross, A.B. admitted that if the sheriff's department had an email from her email address, she thought it would have come from her. However, she maintained that she did not recall sending an email or speaking with the sheriff. On re-redirect, A.B. testified that it was possible that she spoke with the sheriff and sent him an email, but she did not remember doing either. Following A.B.'s testimony, the State rested.

¶ 28    Defendant's first witness was his mother, Gloria Ingle. Ingle is also T.F.'s grandmother. Ingle, defendant, T.F., and his younger cousins moved to Golconda in early 2021. Ingle's problems with T.F. began before the move when they were still living in Tennessee. According to Ingle, T.F. came to understand that his mother did not want anything to do with him, and the move took him

9

away from family and friends. T.F. was angry with her all the time. Defendant helped Ingle with T.F. and T.F.'s younger cousins.

¶ 29 Ingle and T.F. had arguments over T.F. wanting to go live with his girlfriend. These arguments began in the fall of 2021. T.F. told her that he was going to move in with his girlfriend, and Ingle told him that he would have to wait until he turned 18 years old. In January 2022, the day before the disclosure, there was an argument that got out of hand. Defendant spoke up and told T.F. that he was being disrespectful, and then defendant and T.F. started arguing. Ingle described T.F. as being "very angry." That was the last night that T.F. stayed with Ingle. The next day was the day that T.F. made his disclosure to the principal, and he moved in with A.B. that night, at the suggestion of Sheriff Suits. Ingle testified that T.F. never told her about the allegations, and she never witnessed any sexual behavior between T.F. and defendant.

¶ 30 C.B. was a frequent visitor to Ingle's home. Ingle testified that T.F. did not do his chores and she never saw C.B. do them for T.F. C.B. and T.F. would both visit defendant in his apartment. Ingle never saw any sexual behavior between defendant and C.B. Had she seen anything inappropriate, she would have reported it.

¶ 31 On cross-examination by the State, Ingle confirmed that had she known about the abuse, she would have reported it to the authorities. She admitted that she was aware that T.F. was sexually involved with an adult woman who lived in the same apartment complex. Ingle said that she reported this to the police. A police officer came out and spoke with Ingle and the older woman. Ingle testified that she just wanted it to stop; she did not want to get anyone in trouble. Although she discussed T.F.'s relationship with the older woman with the police on two occasions, Ingle never followed up with the investigation. On redirect, Ingle said the police acted like it was a "boys

will be boys" situation. She testified that one of the officers told T.F. to find a girl his own age and to finish school.

¶ 32    Defendant testified on his own behalf. He denied having oral sex with T.F. He denied having oral sex with C.B. He denied having anal sex with C.B. The State did not cross-examine defendant.

¶ 33    During closing argument, defense counsel stated she wanted to talk about "what wasn't presented today." Defense counsel argued the lack of corroborating evidence: the lack of eyewitnesses, the lack of physical evidence, and the lack of an admission from defendant. She argued the only evidence came from three close friends with a motive to fabricate the evidence so that T.F. could live with A.B. Defense counsel pointed out inconsistencies in the witnesses' testimonies, and C.B.'s testimony that he "winged it" when making his initial disclosure. She argued that T.F. was a troubled teenager, and that it was not "beyond the realm" to believe that the three would do or say to get what they wanted, and in this case, T.F. wanted to live with A.B. Accordingly, defense counsel argued that the State failed to meet its burden of proving defendant guilty beyond a reasonable doubt.

¶ 34    Following a recess, the court found defendant guilty of all four charges. In so doing, the court addressed the credibility of the witnesses. The trial court found T.F. candid and honest, noting that he had admitted good and bad things equally. The court also found C.B. to be candid and credible, finding it compelling that C.B. did not want to get involved and just wanted to forget about the abuse. Regarding A.B., the judge stated she did not believe that A.B. lied or committed perjury, but "was very nervous and perhaps at times confused." The judge found A.B. answered general questions by relating them to one specific instance, but found her credible regarding the events that took place at the Dollar General store. The judge also found it likely that the allegations

11

would never have been made without her prompting the boys to report them to the authorities. Insofar as Ingle was concerned, the court found her to be credible, but noted that she was not around T.F. and C.B. all the time. The judge found Ingle biased toward defendant when it came to her testimony that T.F. would often come home intoxicated but that defendant could not have been involved in providing T.F. with alcohol. Finally, the court noted defendant's testimony was "extremely limited" and did not provide her "with much to weigh one way or the other except for to take his statements of innocence at face value," which she did.

¶ 35    Following the preparation of a presentence investigation, defendant's posttrial motion was heard on August 23, 2023. After denying defendant's motion for a new trial, the court sentenced defendant to 14 years in prison on each criminal sexual assault charge and 150 days in the county jail for unlawful delivery of alcohol to a minor, said sentences to be served consecutive to one another. This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, defendant challenges the sufficiency of the evidence as it pertains to the criminal sexual assault charges, asking that this court reverse his convictions. He does not challenge the sufficiency of the evidence supporting the charge of unlawful delivery of alcohol to a minor. Defendant also alleges that his trial counsel was ineffective for failing to impeach the State's witnesses with readily available evidence of their contradictory statements given at the time that the allegations were disclosed to the authorities. For the reasons that follow, we disagree and affirm.

¶ 38    First, we address the sufficiency of the evidence. In order to convict defendant of criminal sexual abuse in count I, the State had to prove defendant committed an act of sexual penetration upon T.F., that T.F. was under 18 years of age when the act was committed, and that defendant

12

and T.F. were family members. 720 ILCS 5/11-1.20(a)(3) (West 2020). In order to prove criminal sexual abuse as alleged in counts II and III, the State was required to prove defendant committed acts of sexual penetration on C.B. and that defendant knew C.B. was unable to give knowing consent to the acts. *Id.* § 11-1.20(a)(2).

¶ 39    Defendant only challenges the sufficiency of the evidence as it relates to the allegations that he committed the acts of sexual penetration. " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person ***." *Id.* § 11-0.1. Defendant does not challenge T.F.'s or C.B.'s ages, T.F.'s status as a family member, or that C.B. was unwilling to give knowing consent to the acts.

¶ 40    The crux of defendant's argument is that the State's witnesses were not credible. In support of his contention, defendant argues (1) that the victims' accounts of the sexual acts were vague; (2) that there were numerous inconsistencies within the witnesses' individual testimonies and conflicts among the witnesses' testimonies; (3) that the evidence demonstrated that the witnesses had a motive to fabricate the allegations; (4) that the evidence suggested T.F. was able to "take advantage of C.B.'s loyalty and impressionability in making allegations of sexual assault against" defendant; (5) that the State's evidence lacked any corroborating or extrinsic evidence; and (6) that defendant testified, without impeachment, that he did not commit the sexual acts. The State responds that defendant's argument is simply asking this court "to re-weigh the evidence, overturn the trial court's credibility findings, and essentially retry the defendant." We agree with the State.

¶ 41    The standard employed when faced with a challenge to the sufficiency of the evidence is well established. When considering such a challenge, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "

13

(Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The standard of reasonable doubt "does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Campbell*, 146 Ill. 2d 636, 374 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), quoting *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 282 (1966)). Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Bush*, 2023 IL 128747, ¶ 33 (quoting *Collins*, 106 Ill. 2d at 261). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)). This "standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Campbell*, 146 Ill. 2d at 375 (quoting *Jackson*, 443 U.S. at 319). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, so improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 42 Regarding the vagueness of T.F.'s testimony, defendant complains that T.F. did not offer an explanation as to why he complied with defendant's requests for oral sex or why T.F. continued

to visit defendant's apartment after being abused. Defendant also argues that T.F. provided no testimony regarding what defendant said, how the acts occurred, how T.F. and defendant "were clothed, how they were positioned, or how long the sexual acts lasted." While acknowledging that such details are not required in a sex offense case, defendant argues that the absence of the details is significant due to the fact that T.F. is not a young child. Defendant cites to no authority for this proposition. We do not find the absence of graphic details from T.F.'s testimony to be fatal to the State's case or to the trial court's determination that T.F. was a credible witness.

¶ 43     Defendant also argues that T.F.'s testimony regarding who he told about the abuse was vague and inconsistent. A review of the record confirms that T.F.'s testimony regarding who he spoke with about the abuse is confusing. On direct examination, T.F. was asked if he "ever reported" the abuse to anyone, and he testified that he had not. During cross-examination, T.F. affirmed that he had never "disclosed" the abuse to anyone before stating that he believed that he had "told some of [his] friends" before again testifying that he never told anyone about the abuse. On redirect, when asked what friends he told about the abuse, T.F. stated that he could not recall before confirming that he had told A.B., C.B., and A.B.'s mother. Part of the confusion in this regard stems from the failure of both parties to establish *when* T.F. had these conversations with other people. Viewing T.F.'s testimony in the light most favorable to the State, the most logical explanation is that T.F. did not tell anyone about the abuse until A.B. witnessed defendant's behavior toward C.B. in the Dollar General store parking lot. We cannot conclude that the confusion surrounding *when* T.F. told other people about the abuse is sufficient to question the trial court's determination that T.F. was a credible witness.

¶ 44    Defendant also maintains C.B.'s testimony is vague and relies on C.B.'s use of the word "they" while answering questions in support of his argument. As an example, defendant notes the following exchange between C.B. and the prosecutor:

> "Q. Okay. And what would take place between you and Matthew Ferrell?
>
> A. They wanted me to get fucked up, he'd try to have his way with me.
>
> Q. And what do you mean have his way with you?
>
> A. Like they fucking me.
>
> Q. Okay. Would anyone else be present at the apartment?
>
> A. No.
>
> Q. When he was trying to have his way with you?
>
> A. No."

Defendant submits that C.B.'s use of the word "they" in these circumstances suggests that more than one person was involved, notwithstanding C.B.'s testimony that only he and defendant were present at the time of the sexual acts and that he had only had sexual relations with defendant. A review of the record, however, suggests that C.B.'s use of the word "they" is an idiosyncrasy particular to C.B. There are multiple times during his testimony that C.B. begins answering a question with "they" despite the fact that he is referring to T.F., or defendant, or himself. For example:

> "Q. [State:] Did you ever, did you and [T.F.] ever go and visit Matthew Ferrell at his apartment?
>
> A. They, they at first we did, but after we hang out more, we walk with him sometimes, not much, yeah, we did go there.

> \* \* \*

16

Q. When it would be you and [T.F.] and Matthew together at the apartment, what would you guys do?

A. They, they, we drink a little bit, usually listen to music, play some cards, just relax.

\* \* \*

Q. Did anything occur between you and Matthew?

A. They, Matthew tried, grabbed my dick in the backseat, I pushed his hand away and he kind of got pissed.

\* \* \*

Q. [State:] So what happened after you kept pushing Matthew's hand away?

A. They, they—Matthew was getting angry, getting pissed.

Q. And after Matthew Ferrell got angry and pissed, what if anything did he do?

A. Um, he—they—he got out of the vehicle and walked, and walked I think back to his apartments."

Given that C.B.'s testimony is replete with examples of his idiosyncratic use of "they," we find that defendant's claim that C.B.'s testimony is vague to the point of undermining his credibility to be without merit.

¶ 45    Similar to his complaint about T.F.'s testimony, defendant likewise complains about C.B.'s lack of specificity when describing the sexual acts that occurred between him and defendant. C.B. often testified in general terms, using "usually" and "sometimes" when describing the conduct. Defendant contends that C.B.'s testimony that he did not know whether defendant ejaculated while performing anal sex upon C.B. demonstrates a lack of corroborating details that that undermines C.B.'s credibility. Defendant also points to C.B.'s "failure" to explain how he ended up in defendant's apartment alone, why he returned to defendant's apartment after the first instance of abuse, or which room in the apartment the abuse occurred. As before, defendant cites to no

17

authority for this proposition, and we do not find the absence of graphic details from C.B.'s testimony to be fatal to the State's case or to the trial court's determination that C.B. was a credible witness.

¶ 46    Defendant also maintains that C.B. lacked credibility due to C.B.'s claim that he told no one, including T.F., about the abuse, and yet the evidence established that T.F. approached C.B. and encouraged him to disclose the abuse. While it is true that neither party asked T.F. the source of his knowledge, it is reasonable to infer based on the record that T.F. reached this conclusion based upon defendant's behavior toward C.B. during the trip to the Dollar General store the day before the disclosure, if not sooner.

¶ 47    Defendant further asserts that C.B. lacked credibility because he testified that he "just winged it" when making the initial disclosure to his principal and law enforcement. Defendant argues that not only was C.B.'s testimony vague, but that "he frankly admitted he did not report a genuine recollection of the events." In support of this argument, defendant relies on the following exchange:

> "Q. [defense counsel:] So I think you had made a comment that you, you don't know if [defendant] ever ejaculated, and if that was different from a statement you had made before where you said that he had, it was because you were just winging it then?
>
> A. They, they—yeah, kind of words trying to think of, trying to remember what happened.
>
> Q. Uh-huh.
>
> A. So I just thought of something, trying to remember the closest thing I had to it so—
>
> Q. So not real memories; just the closest thing that you could come up with?
>
> A. Yeah, that I could think of."

18

Considering C.B.'s testimony as a whole, it appears his use of the phrase "winging it" was more suggestive of the fact that C.B. had not rehearsed or planned what he was going to say to the authorities than suggestive of the notion that he fabricated the abuse.

¶ 48    Defendant next contends that despite the vagueness of the testimony from T.F., C.B., and A.B., there were inconsistencies within their individual testimonies and that there were conflicts between the three State witnesses. Defendant specifically argues that the witnesses contradicted one another regarding the events that occurred during the trip to the Dollar General store. Defendant notes that T.F. testified that he witnessed defendant "touching [C.B.] trying to kiss him and be touchy with him and [C.B.] telling him to stop" and that T.F. further testified he "believe[d]" defendant touched C.B.'s face, but that "[t]here could have been more but that was so long ago, I'm not sure." Defendant contrasts this with A.B.'s testimony that T.F. was inside the store when she saw defendant touch C.B. and her response to defense counsel's question that T.F. did not witness defendant touch C.B.

¶ 49    Defendant's argument is based upon his assumption that the only physical contact between defendant and C.B. on the trip to Dollar General occurred when T.F. was inside the store. While A.B.'s testimony seemingly limits defendant's misconduct during the Dollar General store trip to occurring while T.F. was inside the store, T.F.'s testimony that he witnessed defendant being "touchy" with C.B., and C.B.'s testimony that he "kept on pushing [defendant's] hand away" allows for a reasonable inference that defendant's behavior was not strictly limited to the time T.F. was inside the store. This inference is further supported by A.B.'s testimony that defendant did not angrily insist upon getting out of the car until they had reached the end of the long driveway that led from the Dollar General parking lot to the highway. A.B. could not fairly testify to what T.F.

19

did or did not see when he was present in the car with her. Neither party pressed T.F. or C.B. on precisely when defendant's behavior began or ended during the Dollar General incident.

¶ 50    Defendant notes other contradictions as well: that T.F. testified that he discussed moving in with A.B. during the bus ride on the morning of the disclosure and A.B.'s denial that the topic was discussed on the bus that morning; that T.F. testified that defendant did not have beer in his apartment but later testified that defendant gave C.B. beer; and that C.B. used the pronoun "they" in describing defendant's conduct, suggesting that "someone else was present, or that someone else was involved." As noted above, T.F. later explained that defendant did not keep beer at his place, but that defendant would go down to the gas station and buy beer. Also noted above is C.B.'s idiosyncratic use of the word "they." To the extent that these qualify as contradictions, we find them insignificant to a determination of whether the State proved defendant guilty of sexually abusing T.F. and C.B. We acknowledge that A.B.'s testimony contradicted T.F.'s testimony regarding whether they discussed his moving into her home on the bus, but we also find this insignificant within the context of all the evidence presented. Neither T.F. nor C.B. deviated from their assertions that defendant sexually abused them.

¶ 51    In challenging the sufficiency of the evidence, defendant also notes that T.F. had a motive to fabricate the allegations—so he could live with A.B.—and that the evidence suggested that T.F. was able to take advantage of C.B.'s loyalty as a friend to convince C.B. to fabricate the allegations against defendant. Defendant complains that the trial court's credibility determinations did not address the defendant's theory that T.F. had a motive for fabricating his claims and that C.B. was influenced by T.F. to likewise fabricate allegations. Defendant cites to no authority that requires a factfinder to explain its credibility determinations. That the trial court found T.F. and C.B. credible implies that the trial court rejected the defense theory that T.F.'s desire to move in with A.B. was

20

the motive for the allegations against defendant. Even assuming that T.F.'s motive for disclosing the abuse was so he could move out of the house, such an assumption does not require one to conclude that the allegations themselves were false.

¶ 52    Defendant notes that the "Illinois Supreme Court has held that although credibility determinations by the trial court are 'entitled to great deference, they are not conclusive.' *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001)." Defendant urges this court to reject such deference "in light of the many contradictions and implausibilities in the witnesses' testimonies and the utter lack of corroboration for their allegations." We decline the invitation. A complete reading of the witnesses' testimonies as a whole supports the trial court's conclusion that T.F., C.B., and A.B. were credible, notwithstanding a lack of detail regarding the sexual acts and the largely immaterial contradictions.

¶ 53    It is not the role of this court to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. "Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* Accordingly, this court "will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* ¶ 36. "Under this standard, the eyewitness testimony will be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' " *Id.* (quoting *Cunningham*, 212 Ill. 2d at 280). "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.*

21

¶ 54 Having thoroughly reviewed the evidence in this matter in the light most favorable to the State, and allowing for reasonable inferences therefrom in favor of the prosecution, we conclude the evidence presented was not so unreasonable, so improbable, or so unsatisfactory that defendant's convictions must be reversed. Stated another way, the trial court could have found the essential elements of the offenses beyond a reasonable doubt.

¶ 55 Defendant next argues that trial counsel was ineffective for failing to use the witnesses' prior statements for impeachment purposes. Defendant notes that the presentence investigation included attachments that contained prior statements from T.F., C.B., and A.B. These prior statements are in the form of handwritten statements from T.F. and C.B., an email that appears to be from A.B. to the sheriff's department, a memoranda narrative of the disclosures prepared by the high school principal, and Sheriff Suits's reports memorializing witness statements to the police and, in the case of T.F. and C.B., their interviews at the Two Rivers Child Advocacy Center (CAC). Defendant contends that the prior statements would have demonstrated the unreliability of the State's witnesses while corroborating the defense theory that T.F. and C.B. had a motive to falsely report defendant so that T.F. could move in with A.B. We disagree.

¶ 56 Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill.

22

2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant was a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527 (quoting *Strickland*, 466 U.S. at 697).

¶ 57    To establish deficiency under the first prong of the *Strickland* test, defendant must overcome the strong presumption that the complained-of action or inaction might have been the product of counsel's sound trial strategy. *Manning*, 241 Ill. 2d at 327. The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 58    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 59    Only the most egregious of tactical or strategic blunders may provide a basis for a violation of a defendant's right to the effective assistance of counsel (*People v. Kubik*, 214 Ill. App. 3d 649, 661 (1991)), such as when defense counsel's chosen strategy was so unsound that

23

counsel completely failed to conduct any meaningful adversarial testing (*People v. Reid*, 179 Ill. 2d 297, 310 (1997)). "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court. Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *Id.* at 326-27. We review ineffective assistance of counsel claims *de novo*. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 60 Defendant first argues that trial counsel was ineffective for failing to impeach T.F. with his prior inconsistent statements. Defendant notes that T.F. testified that he performed oral sex on defendant most likely five times, and that he believed that defendant performed oral sex on him once. Defendant contrasts this with his claim that T.F.'s handwritten statement indicated that defendant "had anal sex with me through the past five months." We disagree with defendant's characterization of T.F.'s handwritten statement.

¶ 61 T.F.'s handwritten statement consists of two pages. It has misspelled words and lacks, in part, proper punctuation. It reads, in its entirety:

> "Started in TN We went to get stuff out of storage and he made me suck him off after he had anal sex with me through the past five months he repetivlly tried to do it again but i refuse to let him but now he's drugging me with alcohol Night before last he tried having a 3 way with me n [C.B.], He didnt want me to leave it was very unconfort He jacked off while I was driving, day before yesterday hes made me suck him severual times. My uncle has ejackulated in my mouth and raped me I dont like it Ive told my grandma she think Im lying, but he keeps drugging us with alcohol. He has no bounderie and on top of that hes threatened to kill me hes tried beating me with a pan, but I took it from him before he could. Hes tried getting me to have anal sex with him but I refuse. He drives drunk all the time, with or without me, or other passengers. He doesnt know what no means. Hes touched lexies boobs and butt. He sexually harrasses me all the time I dont feel saf around him. Its just very unconfortable around him. Hes dangerous to himself and others. last night he

24

trashed our apt, and kept screaming at my grandmother. his exact words were 'I cant help everyone is so fucking young around here.' "

Both pages have T.F.'s name printed at the bottom and are dated January 13, 2022.

¶ 62    Given the lack of punctuation, we find it reasonable to conclude that T.F.'s statement about being penetrated anally by defendant occurred in Tennessee, and not during the five months prior to the disclosure. The statement makes more sense if it is read as having a period after "me": "Started in TN[.] We went to get stuff out of storage and he made me suck him off after he had anal sex with me[.] through the past five months he has repetivlly tried to do it again but i refuse to let him[.]"

¶ 63    Defendant argues that defense counsel should have used this handwritten statement to impeach T.F. due to a perceived inconsistency between T.F.'s trial testimony and the written allegations (1) that abuse occurred not only in defendant's apartment, but in a storage "closet," and (2) the defendant's conduct involved masturbating in the car in front of T.F. Regarding the storage "closet," we note that this allegation appears to involve uncharged sexual abuse that occurred in Tennessee. As for the allegation that defendant masturbated in the car in front of T.F., technically this is an omission, and we note that this conduct was neither charged nor fits the legal definition of criminal sexual assault.

¶ 64    T.F. testified that defendant never ejaculated when T.F. was performing oral sex, and never mentioned an incident wherein T.F. alleged he performed oral sex on defendant in his bedroom. Defendant contends that trial counsel should have impeached T.F. with Sheriff Suits's report of T.F.'s CAC interview wherein T.F. reported that defendant ejaculated into T.F.'s mouth during the incident that occurred in T.F.'s bedroom.[2] While T.F.'s testimony denying defendant

---

[2]We note that T.F.'s handwritten narrative also contains allegations that defendant ejaculated in T.F.'s mouth, although it does not state when or where this occurred.

25

ejaculated in his mouth is an inconsistency (and the failure to mention the incident in T.F.'s bedroom is an omission), the danger with pursuing this line of inquiry is that T.F. would have had the opportunity to have his memory refreshed and to explain any inconsistency and omission.

¶ 65    T.F. testified that, during the abuse, he was not intoxicated, was "never drunk," and was unsure whether he had ever been drugged. Defendant argues that defense counsel should have impeached T.F. with the CAC interview wherein he stated that defendant "always gave him alcohol and [T.F.] thought Mathew [*sic*] had put a DATE RAPE PILL (Ambian [*sic*]) in the Alcohol [*sic*] because [T.F.] always passed out prior to some of the Sex Acts with Mathew [*sic*] occurred [*sic*]." We fail to see how pursuing this line of impeachment would have benefited defendant's case: again, T.F. would have had the opportunity to refresh his memory and explain any perceived inconsistencies and omissions. We note that C.B. apparently told investigators at the CAC that, during his second sexual encounter with defendant, he drank some whiskey provided by defendant even though C.B. thought the whiskey "didn't taste right" before passing out. Had this testimony been elicited, it would have bolstered T.F.'s testimony that he was not drunk, would have explained why he was unsure whether he had been drugged, and would have further explained why both boys' testimony was sometimes vague.

¶ 66    Defendant also maintains that trial counsel should have used T.F.'s prior statements to impeach his testimony at trial that he did not know defendant was also abusing C.B. In support of this contention, defendant notes that T.F.'s handwritten statement states that defendant tried to have "a 3 way" with him and C.B., and that T.F. told interviewers at the CAC that C.B. was present "a few times" during defendant's sexual abuse of T.F. Similar to the above argument, the issue with this argument is that there could be an answer to these perceived inconsistencies. Perhaps C.B. was in another room or passed out or otherwise preoccupied during those incidents. These

26

are reasonable inferences based upon the evidence presented at trial. Perhaps trial counsel knew the answers to these questions, or perhaps she decided not to ask questions to which she did not know the answer. Either way, we cannot fault trial counsel for failing to impeach T.F. with these prior statements.

¶ 67    Finally, with regard to T.F., defendant asserts that trial counsel should have used T.F.'s prior statements that defendant had threatened him with violence. We note that this was an omission, and thus T.F.'s prior statements in this regard are not inconsistent. Any attempt by trial counsel to commit T.F. to the fact that defendant had not previously threatened him could have easily backfired and been detrimental to his case. We fail to see how pursuing this line of questioning with T.F. would have assisted defendant's defense.

¶ 68    With regard to C.B., defendant makes similar claims that trial counsel was ineffective for failing to impeach C.B. with his prior statements. At the outset, we note that C.B.'s handwritten statement is filled with misspelled words and is largely illegible, although it is clear that C.B. wrote that defendant had placed his penis in C.B.'s anus and made C.B. perform oral sex on defendant in excess of 30 times. C.B.'s handwritten statement also states he could not get defendant to stop because defendant gave him whiskey to make C.B. do what defendant wanted to do.

¶ 69    Defendant's specific complaints regarding trial counsel's failure to impeach C.B. with his prior statements are as follows: First, that C.B. did not disclose the number of sexual times he was sexually abused by defendant at trial, but that his written statement reflects that C.B. performed oral sex on defendant in excess of 30 times, while the Sheriff Suits's police report (from the day of the disclosure) says C.B. reported performing oral sex on defendant three to five times. We note that Sheriff Suits's report regarding C.B.'s CAC interview discloses no figure on the number of incidents claimed by C.B. Defendant argues that had defendant really engaged in 30 acts over a

four-month period, C.B. would have been able to recall details at trial, such as whether defendant ever ejaculated. We fail to see how allowing C.B. to refresh his memory with a prior statement that he knew defendant ejaculated during anal sex on at least one occasion "because there was some STICKY STUFF coming out of his ([C.B.]) butt" would challenge C.B.'s credibility and help defendant's defense.

¶ 70 Second, defendant argues trial counsel should have used C.B.'s prior statements to challenge the fact that C.B.'s trial testimony omitted his statement to Sheriff Suits that defendant sometimes became violent and threatened to hurt or kill him. Although pursuing this line of cross-examination may have cast some doubt on C.B.'s credibility, it would have come with the risk that C.B.'s answers would have prejudiced defendant.

¶ 71 Concerning A.B.'s testimony, defendant complains that trial counsel failed to perfect her impeachment of A.B. with her pretrial statements to Sheriff Suits and a follow-up email A.B. sent to Sheriff Suits. The email reads, in its entirety:

> "[T.F.] was driving. I was in the passenger seat. [C.B.] and Matthew were in the back seat. [T.F.], [C.B.], and I were all talking when out of o [*sic*] where [C.B.] went silent. I turned in my seat and looked at them. Matt was rubbing [C.B.]'s thighs and private area. [C.B.] kept moving Matt's hand away saying 'stop that's uncomfortable' but matt [*sic*] wouldn't stop."

Sheriff Suits's report of A.B.'s oral statement is consistent with her email, although Sheriff Suits's report adds that A.B. stated that "they eventually got to their destination and everyone got out of the vehicle."

¶ 72 Defendant notes that A.B.'s trial testimony that T.F. was not in the car at the time of this incident is contradicted by her email to Sheriff Suits in that the email suggests that T.F. was in the car at the time of the incident. Accordingly, defendant contends that trial counsel was ineffective for failing to perfect her impeachment of A.B. by introducing the email itself. As we noted above,

28

defendant's argument here is based upon his assumption that the only physical contact between defendant and C.B. on the trip to Dollar General occurred when T.F. was inside the store, and that A.B. could competently testify as to what T.F. did or did not see when he was present in the car with her. Neither party pressed T.F. or C.B. on precisely when defendant's behavior began during the Dollar General incident. Additionally, we note that had trial counsel perfected her impeachment of A.B. by proving she previously stated that T.F. was in the car when defendant began touching C.B., this evidence would have not only impeached A.B., but would have, to defendant's detriment, bolstered T.F.'s testimony that he witnessed the incident.

¶ 73    Given the potential that the introduction of the witnesses' prior statements would have been detrimental to defendant, defendant has not shown that trial counsel's chosen strategy was so unsound that counsel completely failed to conduct any meaningful adversarial testing of the State's evidence (*Reid*, 179 Ill. 2d at 310) or that counsel's approach to the cross-examination of the State's witnesses was objectively unreasonable. *Pecoraro*, 175 Ill. 2d at 326-37. Indeed, given the potential prejudice to defendant that could have come from any attempt to impeach T.F., C.B., and A.B. with their prior statements, we can only conclude that trial counsel's decision to forgo cross-examining the witnesses with their prior statements was the result of sound trial strategy. Having concluded that trial counsel's performance was not objectively unreasonable, we need not address the prejudice prong of the *Strickland* standard. *Richardson*, 189 Ill. 2d at 411.

¶ 74                                III. CONCLUSION

¶ 75    For the foregoing reasons, we affirm the judgment of the circuit court of Pope County.


¶ 76    Affirmed.